CHARLES L. WATSON *et al.*, Plaintiffs-Appellees, *v.* CHICAGO TRANSIT AUTHORITY *et al.*, Defendants-Appellants.

(No. 55921;

First District (3rd Division)—May 17, 1973.

*Rehearing denied July 26, 1973.*

George J. Schaller, O. R. Hamlink, Jerome F. Dixon, and James East, all of Chicago, for appellants Wade, Simmons and Chicago. Transit Authority.

Sidney Robin and Louis G. Davidson, both of Chicago, for appellees Charles L. Watson and Levi Jackson.

Mr. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court:

The plaintiffs, Charles Watson and Levi Jackson, were injured while boarding a Chicago Transit Authority bus. They sued for damages allegedly caused by the defendants, the C.T.A., Wade Simmons the operator of the bus, Walter Jones the driver of an automobile, the proprietors of a bowling alley which sold intoxicating liquor to Jones, and the owner of the building occupied by the bowling alley. A settlement was reached with the dram shop defendants. At the close of the evidence the court directed a verdict against Jones on the issue of liability. The jury returned a verdict against the C.T.A., Simmons and Jones and assessed Watson's damages at $100,000 and Jackson's at $300,000. From the judgments entered on the verdict the C.T.A. and Simmons appealed to the Illinois Supreme Court which transferred the case here. The transfer order stated that the supreme court had no jurisdiction on direct appeal.

The C.T.A. and Simmons were charged in the plaintiffs' complaint with stopping their bus an unreasonable distance from the curb so that in boarding it, Watson and Jackson were compelled to walk into the street where other vehicles were operating, and that by stopping the bus in this manner they violated an ordinance of the City of Chicago which required passenger buses to stop with the right front wheel within 18 inches of the curb. The defendants contest the constitutionality of the ordinance and further argue that there was no evidence the ordinance was violated, that there was no causal connection between the place where the bus stopped and the plaintiffs' injuries, and that the verdict was against the manifest weight of the evidence.

Shortly after 5:30 A.M. on June 11, 1966, Jackson and Watson were waiting at a bus stop on the southeast corner of Pulaski Road and 15th Street for a bus northbound on Pulaski. Waiting with them were Watson's sister, Therese Baggett and her fiance, Joseph Eagle. According to the plaintiffs' evidence, when the bus approached the bus stop it did not pull to the curb although no cars were parked there to prevent it from doing so. Rather, it stopped approximately six feet away from the curb and opened its front door to receive passengers, making it necessary for those wishing to take the bus to walk out into Pulaski Road. Miss Baggett and Eagle boarded the bus without mishap. However, as Watson and Jackson each put one foot on the first step, Jones, who was driving his automobile south on Pulaski, made a left turn into 15th Street. Jones, who had not slept for 24 hours and had spent the night drinking at a bowling alley, lost control of his automobile and it

struck the right front of the bus and both plaintiffs, hurling them to the pavement. The automobile veered onto the sidewalk and came to rest with its front against a fire hydrant and its right wheels in the street. Watson's left leg was severed above the knee and it hung on the bumper of Jones' car. It was necessary to move the car to free the plaintiffs so that an ambulance could take them to a hospital.

In addition to the loss of his left leg, Watson's right thigh was fractured. One of Jackson's legs had to be amputated; he was also paralyzed, his speech was impaired, he suffered bowel and bladder complications and was unable to leave his home. The defendants do not question the damages awarded to either plaintiff.

■■■ The plaintiffs assert that the defendants should not be permitted to question the constitutionality of the ordinance they were charged with violating since this issue was not brought to the attention of the trial court. The record shows that the ordinance was challenged in the defendants' post-trial motion so it may be assumed that the court considered that issue in ruling upon the motion. Furthermore, as two of the allegations of negligence in the complaint (failing to stop the bus within 18 inches of the curb and taking on passengers other than at a designated loading place) were based upon the violation of the ordinance, its validity directly affected the existence of the plaintiffs' cause of action. The question of whether a complaint fails to set forth grounds of liability which the law will recognize can be raised at any time. (*Wagner v. Kepler* (1951), 411 Ill. 368, 104 N.E.2d 231; *Hodorowicz v. Szulc* (1958), 16 Ill.App.2d 317, 147 N.E.2d 887.) We will, therefore, consider the defendants' contention.

Relevant provisions of the ordinance (Municipal Code of Chicago, 1958, ch. 27, sec. 276(b),(c)) were received in evidence at the trial and instructions pertaining to them were read to the jury. The ordinance provides:

> Par. (b) "The driver of a bus shall not stop such vehicle upon any street at any place for the purpose of loading or unloading passengers other than at a designated bus stop, bus stand, passenger loading zone, or bus terminal except in case of emergency."
> Par. (c) "The driver of a bus shall enter a bus stop or passenger loading zone on a public street in such a manner that the bus when stopped to load or unload passengers shall be in a position with the right front wheel of such bus not further than eighteen inches from the curb and the bus approximately parallel to the curb so as not to unduly impede the movement of other vehicular traffic."

■■ The defendants argue that the legislature has not given municipal-

ities the power to adopt such regulations and that the Uniform Act Regulating Traffic on Highways, 1935 (Ill. Rev. Stat. 1965, ch. 95½, par. 98 *et seq.*), precluded the City from controlling the operation of buses when temporarily engaged in loading or unloading passengers. It is provided in section 25 of the Uniform Act that: "* * * no local authority shall enact or enforce any ordinance, rule or regulation in conflict with the provisions of this Act unless expressly authorized herein." Section 26(a)(1) of the Act permits local authorities to regulate the standing and parking of vehicles. The term "park" is defined in section 19(c) to mean, when prohibited, "the standing of a vehicle, whether occupied or not, otherwise than temporarily for the purpose of and while actually engaged in loading or unloading." Because of this definition, the defendants contend the City's ordinance is incompatible with the statutes and invalid. The reasoning seems to be that a local authority is only permitted to regulate parking when it is of a more permanent nature than the brief standing of buses to load and unload passengers. This argument is without merit. Not only does section 26(a)(1) of the Uniform Traffic Act permit municipalities to regulate the standing of vehicles, but section 25 empowers them to adopt additional traffic regulations which are not "in conflict with the provisions of this Act."

■■■ The State may assume complete control over the regulation of streets and highways, thus depriving municipalities of any power or authority over them. (*City of Rockford v. Floyd* (1968), 104 Ill.App.2d 161, 243 N.E.2d 837.) However, our legislature has not chosen to do this. In Ill. Rev. Stat. 1965, ch. 24, par. 11—80—2, it is provided that: "The corporate authorities of each municipality may regulate the use of the streets and other municipal property." Such power includes the right to impose reasonable conditions and restrictions in order to promote the general welfare and prevent accidents. (*Yellow Cab Co. v. City of Chicago* (1947), 396 Ill. 388, 71 N.E.2d 652.) The City of Chicago used this authority in enacting the ordinance, which has been treated by this court as a public safety measure. (*Gauchas v. Chicago Transit Authority* (1965), 57 Ill.App.2d 396, 206 N.E.2d 752.) The provisions of the ordinance are not in conflict with State law and the City did not exceed its authority in adopting them.

■■ Sections 25 and 26(b) of the Uniform Act also provide that municipal traffic regulations shall not be effective until signs giving notice of them "are posted upon or at the entrances to the highway or part thereof affected as may be most appropriate." Therefore, the appellants urge as alternative reasons for the invalidity of the City ordinance that it did not provide for the posting of warning signs, that the City did not post the sign at the bus stop, and that those signs which

were erected did not provide sufficient notice of the regulation. It is undisputed that there were signs on the southeast corner of Pulaski and 15th Street informing the public of the bus stop at that location and that parking was forbidden. Sections 25 and 26(b) of the Act do not require that each municipal traffic regulation be accompanied by a provision for the posting of a sign, or that the municipality itself must erect the sign. What is mandatory under the Act is that "signs  *  *  *  are posted  *  *  *." It is immaterial that·the C.T.A. rather than the City was responsible for the erection of the sign, as long as there was adequate notice of the municipal regulation.

Paragraph (b) of the ordinance provides that buses must stop at designated stops or zones for the purpose of loading or unloading passengers. Since the sign at the east curb of Pulaski pointed out the bus stop, it constituted sufficient notice to bus drivers that they were to stop at that location. Indeed, the defendant Simmons testified that he was familiar with the intersection of Pulaski and 15th Street and knew there was a bus stop sign on the southeast corner.

The sign did not specify the position buses had to be in, relative to the curb, when stopped to receive or discharge passengers. However, the regulations enacted in paragraph (c) of the ordinance had been incorporated into the rules of the C.T.A. The rule provides:

> "(a) The operator of a bus shall enter a Bus Stop Zone in such a manner that when standing to load or discharge passengers the right front wheel shall be not more than eighteen inches from the curb and the bus approximately parallel to the curb  *  *  *."
> Chicago Transit Authority Rule 103(a).

It may be assumed that the.C.T.A. and its agents were aware of their own rules.

■■  The provisions of the ordinance here considered are of much broader scope than those which seek to regulate conditions on a particular highway or part thereof, such as, for example, rules concerning the maximum speed at which vehicles may travel. Although paragraphs (b) and (c) bear upon a single class of motorists—bus drivers—they apply uniformly on a city-wide basis. We do not believe that the legislature could have intended that regulations such as those set forth in paragraph (c) had to be posted at the innumerable locations in the City where buses are required to stop to load or unload passengers. Since paragraph (c) of the City ordinance and rule 103(a) of the C.T.A. are identical in meaning, once the posted sign has made the bus driver aware of the presence of a bus stop, he can be held to have notice of the required position in which his vehicle has to stop. We reject, there-

fore, the C.T.A.'s and Simmons' alternative arguments as to the invalidity of the ordinance.

■■ They next argue that there was no evidence they violated either paragraph (b) or (c) of the ordinance. Watson, Eagle and Therese Baggett Eagle testified· that the bus did not pull to the curb, but remained at least six feet or four paces away. The Eagles also declared that the bus stopped in the crosswalk, which was outside the designated bus stop. Witnesses for the defense claimed that the bus stopped close to the east curb of Pulaski, within the area assigned as a bus stop. However, the chief defense witness, Simmons, the driver of the bus, conceded that after he stopped the bus he saw Jones' car, a car length away, coming from the north and that it was to his right, thereby lending support to the plaintiffs' contention that the bus was some distance from the curb. Furthermore, Simmons admitted that he had stated in a pre-trial deposition that when he saw the· southbound car a portion of it was in the lane closest to the east curb and a portion of it was in the second lane from the curb. A conflict in the evidence was created which the jury resolved against the defendants. At the defendants' request there was submitted to the jury a special· interrogatory which inquired: "Was the right front wheel of the C.T.A. bus within 18 inches of the east curb of Pulaski Road and the bus approximately parallel to that curb just before and at the time of the occurrence involved in this suit?" The jury answered the interrogatory in the negative, thus unequivocally voicing its belief that the defendants violated the ordinance. Its finding that the defendants violated the ordinance was supported by substantial evidence and we will not set it aside.

■■ A violation of an ordinance constitutes prima facie evidence of negligence and creates a cause of action if it is the proximate cause of the resulting injuries. (*Gauchas v. Chicago Transit Authority.*) The defendants contend that if there was a breach of the ordinance it was not the proximate cause of the plaintiffs' injuries. Watson testified that it was necessary for him and Jackson to leave the curb and walk out into the street in order to board the bus. They were thus compelled to expose themselves to danger from vehicles on the roadway. The defendants counter that they would have been injured by Jones' car even if they had remained on the sidewalk. Obviously, the jury did not agree with this view of the occurrence as it found that Simmons and the C.T.A. as well as Jones, were liable for the plaintiffs' injuries.

■■ Questions of proximate cause are customarily questions of fact for a jury to decide. (*Ney v. Yellow Cab Co.* (1954), 2 Ill.2d 74, 117 N.E.2d 74.) The Jones car struck the bus on the right front and then

the plaintiffs who were at the right front door. If the bus had been 18 inches ·or less from the curb instead of six feet away, and if Jones' car continued in the same path, the bus would have been struck on its left front. It would have served as a protective barrier between the car and the plaintiffs on the curb. Even if the car swerved in some manner from its indicated pathway, a correctly positioned bus would have enabled the plaintiffs to jump away from the oncoming auto or to escape by quickly boarding the bus. Also, had the bus halted at the curb, the time required for the plaintiffs to get on it would have been less than that needed to walk out into the street to do so. The Eagles found safety in the bus and the difference of a few seconds might have saved Watson and Jackson from injury.

■■■ The defendants' negligence in violating the ordinance, or their common law negligence in stopping an unreasonable distance from the curb, did not have to be the only cause for the plaintiffs' injuries in order for the defendants to be liable. It was sufficient if it concurred with some other cause which, acting simultaneously, caused the injury. (*Lutz v. Chicago Transit Authority* (1962), 36 Ill.App.2d 79, 183 N.E.2d 579.) In such a situation one guilty of negligence cannot avoid responsibility merely because another person is guilty of negligence contributing to the same injury, even though the injury would not have occurred but for the negligence of the other person. (*Naslund v. Watts* (1967), 80 Ill. App.2d 464, 224 N.E.2d 474.) The plaintiffs sufficiently established that the negligence of the defendants in either violating the ordinance or in forcing prospective passengers to board the bus out in the street proximately caused their injuries.

■■■ The complaint is made that the verdict resulted from sympathy and was against the manifest weight of the evidence. No specific instances are cited to support the speculation that ·the sympathy of the jurors was aroused for the plaintiffs. The testimony concerning the plaintiffs' injuries was extremely brief, provided only by Watson and by the wife of Levi Jackson, as Jackson's paralysis prevented him from being in court. However, the defendants emphasize that they produced several disinterested witnesses (two firemen, two neighborhood residents, and a policeman) who testified ·that the bus was stopped in the position required by the ordinance. They argue that this testimony should have been accepted by the jury in· preference to the plaintiffs' evidence, as Watson, his sister and Eagle his brother-in-law, had an interest in the outcome of the case. The jury was fully apprised of this relationship and of the facts and circumstances regarding the accident as the witnesses remembered them. Since the evidence was conflicting and substantial factual questions were in dispute, and since different inferences could be

drawn from those facts, the determination of the truth depended upon the jury's evaluation of the credibility of the witnesses. (*Winston v. Chicago Transit Authority* (1971), 2 Ill.App.3d 151, 276 N.E.2d 65.) It is the jurors who are the sole judges of such credibility and the weight to be accorded the testimony. (*Moore v. Checker Taxi Co.* (1971), 133 Ill.App.2d 588, 273 N.E.2d 514.) That the defendants produced the greater number of witnesses did not make their version of the accident the one the jury had to accept.

The jury's verdict was supported by substantial evidence and the judgment is affirmed.

Affirmed.

McNAMARA and McGLOON, JJ., concur.