**Donna HYLIN, Individually and as Administrator of the Estate of Donald Hylin, Deceased, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 81–2931.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 10, 1983.

Decided Aug. 23, 1983.

Rehearing and Rehearing En Banc Denied Dec. 7, 1983.

Keith L. Davidson, Chicago, Ill., for plaintiff-appellant.

James P. Klapps, U.S. Dept. of Justice, Washington, D.C., for defendant-appellee.

Before BAUER, WOOD and ESCHBACH, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Plaintiff, Donna M. Hylin, appeals from the judgment of the district court in favor of defendant, the United States, in an action brought under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. (FTCA). The district court found that the allegedly negligent acts and omissions of federal mine inspectors were not the proximate cause of the death of plaintiff's husband, Donald Hylin. The government supports this finding, but, contrary to the district court's ruling, also argues that federal regulatory enforcement activities, conducted under the authority of the Federal Metal and Nonmetallic Mine Safety Act, 30 U.S.C. § 721 et seq. (1976) (Mine Safety Act), cannot give rise under these circumstances to a cause of action under the FTCA. We reverse the district court's finding with respect to proximate cause and hold that plaintiff is entitled to recovery under the FTCA.

## I.

The facts in this case are largely undisputed. Donald Hylin, a twenty-year employee of the Ristokrat Clay Products Company, a business engaged in mining clay and manufacturing clay bricks in the State of Illinois, was electrocuted on September 1, 1977 when he came into contact with a defective electrical junction box in a conveyor room at the mine. The box was located on the east wall of a passageway connecting the grinding room with a dust bin area. Running the entire length of the passageway was a conveyor belt which carried the mined clay. On both sides of the belt were narrow walkways. The walkway on the east side ran the entire length of the conveyor and up the incline to the dust bin area. The walkway on the west side only extended to the incline ramp. Each walkway, at the time of the accident, was separated from the conveyor belt by newly erected handrails which are at issue

in this case and which were erected by the mine in an attempt to comply with a citation resulting from a federal inspection. The clearance between the junction box, located approximately halfway down the east walkway, and the handrail on that side of the conveyor was reduced to about fourteen inches by the new handrails.

At the time of Hylin's death, and for many previous years, the junction box was in damaged and dangerous condition and in violation of federal standards.[1] The cover of the box lacked effective means to keep it closed, the wires entering the box were inadequately insulated where the conductors entered the box, and there were two holes in the cover of the box that had been caused by a short circuit or ground fault some seven or eight years prior to Hylin's death.

As a clay mine operation, Ristokrat was subject to the jurisdiction of the Mine Enforcement and Safety Administration (MESA). It was MESA's function, under the authority of the Secretary of the Interior, to enforce the provisions of the Mine Safety Act as amended, including the mandatory safety standards promulgated thereunder and published under Title 30, Part 55 of the Code of Federal Regulations. On February 10 and 11, 1977, several months before Hylin's death, the mine was inspected, pursuant to the Act, by MESA inspectors Donald Johnson and John Guthrie. Neither during this regular inspection nor at a follow-up spot inspection conducted on March 1, 1977, did MESA inspectors inspect the junction box although they observed it and saw its dangerous condition. The inspectors also noticed that the conveyor belt was unguarded and that the workers had a practice of crossing over the conveyor while the belt was in use. The inspectors cited the mine for a violation of 30 C.F.R. § 55.9–7 which required that all conveyors either have guards or be equipped with emergency stop devices.[2] Notice was given

---

1. It is undisputed that the condition of the junction box violated the applicable regulations under the Mine Safety Act contained at 30 C.F.R. §§ 55.12–8, 55.12–13, 55.12–30, 55.12–32 (1976).

2. 30 C.F.R. § 55.9–7: Mandatory. Unguarded conveyors with walkways shall be equipped with emergency stop devices or cords along their full length.

of the violation with directions that the condition be abated.[3]

The nature of the continuous processing of clay dust from the grinding operation to the conveyor to the dust bins rendered the installation of an emergency stop device on the conveyor infeasible. The use of a stop device would result in clay piling up on the conveyor and jamming the machines. At the time of the citation, the infeasibility of using the stop device was explained by mine personnel to inspector Guthrie who acknowledged that the handrail therefore necessarily would be the mine's response to the Notice of Violation. The mine, with the inspectors' knowledge, subsequently constructed two-by-four handrails along both sides of the conveyor.[4]

At the time of the inspection, the senior MESA inspector, Johnson, was aware from observing footprints and from conversations with Ristokrat's employees that it had been the employees' previous custom to travel from the grinding room to the dust bin area by walking along the west side of the conveyor, crossing the conveyor, and then walking up the incline ramp; this route was preferred to the east walkway because it was wider and not obstructed by chutes and the electric junction box. After the handrails were constructed pursuant to the MESA citation, the workers were forced to traverse the narrower east passageway that was already partially obstructed by the junction box; the construction of the handrails further narrowed the clearance in the passageway between the box and the conveyor by at least four inches. It was in the course of following this newly necessitated route that plaintiff was electrocuted by the junction box.

The plaintiff, individually and as administratrix of her husband's estate, sued the United States under the FTCA for the alleged negligence of the MESA inspectors.

Plaintiff's first contention was that the negligent failure of the inspectors to observe and cite for corrections the dangerous electrical junction box caused her husband's death. Alternatively, she claimed that the enforcement of the mandatory safety standard requiring handrails, recognized by both the mine owner and the inspectors as the only practical solution, had either created or increased the risk of injury from the defective junction box.

The district court, without a jury, tried only the liability issue. The government offered no evidence.

The court ruled in favor of the government on both liability theories proffered by the plaintiff—negligent failure to inspect, and negligent enhancement of risk. With regard to the latter theory, the court concluded that there was no evidence that the defendant had ever enhanced the risk of electrocution by ordering erection of the handrail and that the evidence instead showed that the erection of the handrail resulted from Ristokrat's choice. The district court further held that the erection of the handrail was not a proximate cause of plaintiff's death. With respect to the first theory—negligent failure to inspect and cite—the district court did not explicitly determine whether the inspectors' failure was negligent, but instead held that the plaintiff's death was not proximately caused by the defendant's failure to inspect but rather by Ristokrat's negligence in maintaining the box in defective condition.

Plaintiff appeals from the district court's finding with respect to both theories, arguing that the evidence clearly establishes negligence and proximate cause. The defendant argues that the district court's determination regarding proximate cause was correct, but argues further that, even if it were not correct, the Federal Mine Safety Act creates no duty or reliance between the

30 C.F.R. § 55.11–1: *Mandatory.* Safe means of access shall be provided and maintained to all working places.

**3.** Notice of Violation No. 53 states: "55.9–7 (Notice No. 53) issued February 10, 1977. An inside handrail or an emergency stop device was not provided on the incline belt conveyor. Shall be abated by February 24, 1977."

**4.** Inspector Guthrie's report from the spot, or follow-up inspection conducted March 1, 1977 states:

"55.9–7 (Notice No. 53) issued February 10, 1977 was abated March 1, 1977. An inside handrail was provided on the incline belt conveyor."

defendant and the plaintiff or the mine sufficient to support a finding of negligence under Illinois tort law, which is expressly made applicable by the FTCA.

## II.

■■■ The Federal Tort Claims Act renders the United States "liable ... in the same manner and to the same extent as a private individual under like circumstances ...." 28 U.S.C. § 2674. The substantive law governing the imposition of liability in each FTCA case is "the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b). It is well established, moreover, that FTCA liability may be based even on conduct which is "uniquely governmental," such as inspection and certification, as long as the state in which the conduct occurred would recognize liability if the government tortfeasor were a private person. *Indian Towing Co. v. United States,* 350 U.S. 61, 69, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955). While the government is correct in asserting that the violation of a duty created by a federal statute and its implementing regulations *alone* does not create an FTCA cause of action, *Baker v. F. & F. Investment Co.,* 489 F.2d 829, 835 (7th Cir.1973), the issue here is not the violation of a federal duty alone but whether the conduct complained of breached a duty existing under Illinois law. *United Scottish Insurance Co. v. United States,* 614 F.2d 188, 193 (9th Cir.1982); *Raymer v. United States,* 660 F.2d 1136, 1140 (6th Cir.1981). That the United States may thereby become liable under "novel and unprecedented forms of liability," *United States v. Muniz,* 374 U.S. 150, 159, 83 S.Ct. 1850, 1856, 10 L.Ed.2d 805 (1962), does not undermine the FTCA's admonition that the government shall be liable "in accordance with the law of the place where the act or omission occurred." Thus, the first issue put before this court by the government is really whether Illinois law would permit the finding of negligence in this case if the United States were a private person. *Blessing v. United States,* 447 F.Supp. 1160, 1186 (E.D. Pa.1978).

■ We think that the Illinois courts would permit a finding of negligence here

under the plaintiff's second theory of liability—the increase in risk of injury created by the MESA inspectors' effectively non-optional instruction to build a handrail which had, as we discuss *infra,* the foreseeable effect of diverting worker ingress to the dust bin past the dangerous junction box through a passageway which was further narrowed by the erection of the handrail. Because we find that Illinois law would permit a finding of negligence in this extraordinary instance of the positive creation of increased danger by an inspector, we need not determine today whether Illinois would recognize liability under the plaintiff's first—and frankly more troubling—theory of mere negligent failure to inspect the junction box and order correction.

The basis of liability under both of plaintiff's theories is the "good samaritan doctrine" as enunciated in the Restatement (Second) of Torts § 324A (1965) and adopted by the Illinois courts. *Pippin v. Chicago Housing Authority,* 78 Ill.2d 204, 210, 35 Ill.Dec. 530, 399 N.E.2d 596 (1979) ("In assessing [the inspector's] duty in tort owed to Pippin as a result of its contract with the Authority, we find section 324A of the Restatement (Second) of Torts to be apposite."); *Cross v. Wells Fargo Alarm Services,* 82 Ill.2d 313, 317, 45 Ill.Dec. 121, 412 N.E.2d 472 (1980); *Chisolm v. Stephens,* 47 Ill.App.3d 999, 1005, 7 Ill.Dec. 795, 365 N.E.2d 80 (1st Dist.1977); *Green v. City of Chicago,* 48 Ill.App.3d 502, 504, 6 Ill.Dec. 696, 363 N.E.2d 378 (1st Dist.1976). The Restatement (Second) of Torts § 324A provides as follows:

§ 324A. Liability to Third Person for Negligent Performance of Undertaking

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

The essence of plaintiff's second theory—that the MESA inspectors failed to exercise reasonable care in ordering the erection of the handrail, thus increasing the likelihood of electrocution—is, of course, echoed in Section 324A(a), while the plaintiff's first theory, negligent inspection, is reflected in Section 324A(b) and (c).

As we understand the government's argument, it disputes primarily that there could ever be negligence here under the negligent inspection theory reflected in Sections 324(b) and (c) because neither has MESA "undertaken to perform a duty [*i.e.* to ensure a reasonable safe work environment] owed by the other [the mine] to the third person [the plaintiff]" under Section 324A(b) nor was the "harm ... suffered because of reliance of the [mine] or the [plaintiff] upon the undertaking." The absence of such a prerequisite "duty" or "reliance," the government argues, is facially apparent from the caveats contained in Section 2 of the Mine Safety Act, 30 U.S.C. § 801, under which the inspection was conducted. Section 801(e) states that "the operators of such mines with the assistance of the miners have the primary responsibility to prevent the existence of such unsafe and unhealthful conditions and practices in such mines." Section 801(g) further states that "[i]t is the purpose of this chapter ... (2) to require that each operator of a coal or other mine and every miner in such mine comply with such standards" as are promulgated under the Act by the Secretaries of Health and Human Services and Labor. The government contends that this statutory placement of responsibility precludes a court from finding the requisite duty or reliance as a matter of law.

We note that the Sixth Circuit has found this argument convincing, holding in *Raymer v. United States,* 660 F.2d 1136, 1143 (1981), that "[i]n the face of this language which completely negates the idea that responsibility for mine safety has been shifted to the federal government, it would be unreasonable to rely on the mere failure of federal inspectors to require immediate abatement of the ... [violation]." But whatever the force of this position, and it has been questioned by some Ninth Circuit decisions finding FTCA liability for inspections conducted under Federal Aviation Administration statutes containing similar "primary responsibility" boilerplate,[5] and whatever its applicability under the Illinois tort doctrines concerning mere failure to inspect, the "reliance" and "duty" requirements of Sections 324A(b) and (c) cannot block recovery here, for plaintiff's second theory of liability rests wholly on the "increased risk of harm" theory of Section 324A(a).

Although we have found no Illinois cases involving actions founded on ameliorative conduct engendering an increase in the risk of harm rather than a mere failure to act,[6]

---

**5.** *See, e.g., S.A. Empresa de Viacao Aerea Rio Grandense v. United States,* 692 F.2d 1205, 1208 (9th Cir.1982); *United Scottish Insurance Co. v. United States (II),* 692 F.2d 1209, 1211 (9th Cir.1982); *but see, Clemente v. United States,* 567 F.2d 1140, 1149 (1st Cir.1978).

**6.** The court in *Cross v. Wells Fargo Alarm Services,* 82 Ill.2d 313, 317, 45 Ill.Dec. 121, 412 N.E.2d 472 (1980), briefly noted plaintiff's claim against a private security agency for the latter's *failure to inspect or evaluate* after-hours security conditions in a public housing unit. The claim was formally premised on both Sections 324A(a) and (c). In dismissing the complaint, the court discussed the failure of the plaintiff to plead reliance by the public housing authority on such evaluations. However, the two-theory context of the discussion and the factual inappositeness of a mere "failure to inspect or evaluate" claim to Section 324A(a) analysis suggests that the court did not mean to impute the "reliance" requirement, contained only in Section 324A(c), to 324A(a) as well. Instead, the court apparently disposed of the Section 324A(a) claim by relying on its earlier finding that defendant assumed no contractual obligation at all to conduct the evaluations, thus finding unsatisfied the basic Section 324A requirement that the defendant at least "undertake[] ... to render [the disputed] services ...." That the Illinois Supreme Court, when addressing the issue more fully, has kept the requirements of subsection (a) analytically distinct from the "reliance" and "duty" prerequisites of subsections (b) and (c) is demonstrated in *Pippin v. Chicago Housing Authority,* 78

it is quite clear from an examination of Section 324A and its commentary that liability may be imposed for a defendant's actions increasing the risk of harm, even though there is no evidence that defendant had assumed an employer's or proprietor's general duty of providing reasonably safe conditions to his employees or customers and no evidence that the employees or customers "relied" to their detriment on the defendant's provision of services.

First, as a textual matter, Section 324A's three theories—increase in risk of harm, assumption of duty, and reliance—are phrased in the disjunctive; while subsections (b) and (c) contain the words "duty" and "reliance," subsection (a) is conspicuously devoid of such terms. Second, the text's accompanying illustrations and commentary suggest that liability under Section 324A(a) may exist without presence of "duty" or "reliance." Illustration 1, for example, sets forth this vignette:

> 1. A operates a grocery store. An electric light hanging over one of the aisles of the store becomes defective, and A calls B Electric Company to repair it. B Company sends a workman, who repairs the light, but leaves the fixture so insecurely attached that it falls upon and injures C, a customer in the store who is walking down the aisle. B Company is subject to liability to C.

Thus, liability is placed upon the outside actor even though it has not, as the government would analogously have us assume here, either caused customers or the company to rely on its undertaking with respect to store maintenance or assumed the company's duty to maintain a reasonably safe store. That the defendant's actions increasing risk need not occur as part of a general duty or trigger "reliance" to be actionable under Section 324A(a) is also underscored by comment d which states, "*Even where the negligence of the actor does not create any new risk or increase an existing one,* he is *still* subject to liability if, by his undertaking with the other, he has undertaken a duty which the other owes to the third person." (emphasis added). Such commentary suggests that increased risk of harm provides a wholly independent and self-sufficient, rather than a subsidiary, basis for liability. *See also Pippin v. Chicago Housing Authority,* 78 Ill.2d 204, 211, 35 Ill.Dec. 530, 399 N.E.2d 596 (1979) ("Interstate's duty does not arise under either subsection (a) or (b), as plaintiff's complaint does not allege that Interstate's conduct actually increased the risk of harm to Pippin, and . . . there was no preexisting duty . . . . Subsection (c), however, sets up reliance upon the undertaking as a *separate basis for* finding liability." (emphasis added)).

And this reading, we believe, comports most fully with common sense and sound policy. The disjunctive regime of liability under Section 324A simply affords less protection to actors who, like the MESA inspectors here, positively intermeddle and create new dangers, than to actors who, without some assumption of total responsibility, refrain from changing the *status quo* they observe. This regime is consonant with the good samaritan concept as with much of tort law by fully encouraging only more modest and passive forms of altruism.

In sum, we find that Section 324A, as adopted by the Illinois courts, allows recovery by the plaintiff in this case even assuming *arguendo,* as the government contends, that MESA neither created reliance by miners on safety inspections nor caused the government to assume the employer's role of guarantor of safe job conditions.

We are not the first federal court to recognize the appropriateness of an FTCA action rooted in state tort law corresponding to Restatement (Second) of Torts § 324A(a). Several federal cases have alluded to the applicability of this analysis while finding that the facts of the case did not meet the Section's requirements. *See, e.g., Raymer v. United States,* 660 F.2d 1136, 1143 (6th Cir.1981); *Clemente v. United States,* 567 F.2d 1140, 1145 (1st Cir.1978); *Blessing v. United States,* 447 F.Supp. 1160, 1197 (E.D.Pa.1978). The government has presented no argument, and we know of none that exists, for the proposition that

Ill.2d 204, 211, 35 Ill.Dec. 530, 399 N.E.2d 596    (1979), quoted in text *infra* at 1212.

the principles of Section 324A(a) are inapplicable to the acts of MESA inspectors. We, therefore, affirm the district court's holding that a cause of action exists under Illinois law against a private person for a negligent inspection which increases the risk of harm to the beneficiaries of that inspection. As the action is recognized by the State of Illinois against private individuals, the FTCA's limited waiver of sovereign immunity applies and the United States may be held liable for similarly negligent post-inspection actions ordered on its behalf.

### III.

The government urges alternatively that, even if a valid cause of action otherwise exists for the inspector's enhancement of risk under Illinois tort law and hence the FTCA, such a claim is barred under the "discretionary function" exception in the FTCA, 28 U.S.C. § 2680(a). We find this contention to be without merit.

The Supreme Court has not comprehensively defined the scope of the "discretionary function" exception, other than to note that it "includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion." *Dalehite v. United States,* 346 U.S. 15, 35–36, 73 S.Ct. 956, 967–968, 97 L.Ed. 1427 (1953). The great weight of authority suggests that where, as here, the disputed conduct consists of merely implementing and enforcing mandatory regulations, the requisite halo of policy-making is not present. *See, e.g., United Scottish Insurance Co. v. United States,* 692 F.2d 1209, 1212 (F.A.A.'s negligent certification of aircraft not within discretionary function exception, noting "F.A.A. officials enforce the requirements by inspecting the aircraft, but cannot in any way change or waive safety requirements. Since no room for policy judgment or decision exists, a discretionary function is not being performed . . . ."); *Schindler v. United States,* 661 F.2d 552, 556 (6th Cir.1981) (regulatory approval granted in conformance with federal regulatory criteria not discretionary function); *Downs v. United*

*States,* 522 F.2d 990, 997–98 (6th Cir.1975) (exception only encompasses exercise of quasi-legislative or quasi-judicial function; mere fact that governing regulations permit choosing alternative courses of action does not invoke exception); *Griffin v. United States,* 500 F.2d 1059, 1066 (3d Cir.1974) (fact that implementation of regulation calls for some judgmental determination with reference to criteria in regulation does not invoke exception as such determinations are of expert rather than public policy character).

Here, there is no dispute that the applicable MESA regulations compelled the erection of the handrail. 30 C.F.R. § 55.9–7 was a mandatory standard requiring that conveyors be either guarded or equipped with emergency stop devices; in this case, the inspectors knew that the handrail option had to be chosen. The inspectors were required by 30 U.S.C. § 727(b) to, and did, issue the corrective order. While the inspectors were also adjured by the MESA Inspection and Investigation Manual to "not create a dangerous situation in enforcing compliance with a standard," such an instruction is hardly more than a restatement of the due care incumbent on any civil servant carrying out predetermined regulatory imperatives; it does not call for the exercise of quasi-legislative or -judicial judgment, *Downs,* 522 F.2d at 997–98.

By contrast, *Bernitsky v. United States,* 620 F.2d 948 (3d Cir.1980), *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 208 (1981), cited by the government, involved a mine inspector's issuance of a withdrawal order after the mine's repeated failure to comply with citations. In holding such action within the "discretionary function" exception, the court emphasized that the controlling statutory provision required the inspector, before issuing such an order, to determine such discretionary factors as "imminent danger" and a "reasonable time" for abatement, and to choose among "different types of enforcement actions available." 620 F.2d at 954–55. Here, however, the applicable regulations made clear that there was only one enforcement action available upon discovery of the conveyor's condition:

the abatement order which effectively compelled the construction of the handrail. In any event, to the extent that *Bernitsky* can be read as a blanket extension of the "discretionary function" exception to all regulatory enforcement, we think that it fails to properly respect the distinction between policy-making and implementation articulated in the Supreme Court's *Dalehite* decision and subsequent appellate interpretations, including directly apposite inspection cases such as *United Scottish Insurance Co., supra.* If the nearly automatic issuance of the citation here were considered to be a "discretionary function," it would be hard to imagine any governmental activity which would be actionable under the FTCA.

### IV.

We now reach the question that is formally before us on appeal: the correctness of the district court's finding that any negligence of the government inspectors was not the proximate cause of Donald Hylin's death. Although the trial judge did not make a specific finding that the government inspectors were negligent in the performance of their good samaritan tasks, the trial court's "inquiry into proximate causation presupposes an affirmative finding of negligence." *Glenview Park District v. Melhus,* 540 F.2d 1321, 1325 (7th Cir.1976), citing 65 C.J.S. *Negligence* § 103 at 1134 (1966). The evidence in the record as it appears before this court supports a finding that the MESA inspectors were negligent in failing to take into account the effect of the Notice of Violation which resulted in the construction of the handrails which narrowed the passageway and forced the workers to walk by the dangerous junction box.

The Notice of Violation No. 53 was considered a mandatory notice. 30 C.F.R. § 55.9–7 requires that "unguarded conveyors with walkways shall be equipped with emergency stop devices or cords along their full length." The MESA inspectors had no choice but to issue the notice. There was no negligence, and the plaintiff does not so claim, in the issuance of Notice of Violation No. 53 alone. The inspectors' negligence was in failing to consider the consequences of their action. The MESA Inspection and Investigation Manual instructs that "[a]n inspector shall consider his action during the inspection and shall not create a dangerous situation in enforcing compliance with a standard." MESA inspectors Donald Johnson and John Guthrie failed to do so. While liability under the FTCA cannot be based on the violation of a federal statute or regulations, the regulations may provide guidance as to the standard of care that a reasonable person owes in a given situation. *United Scottish Insurance Co. (I), supra,* 614 F.2d at 195 n. 9 ("Once the court has found an actionable duty under state law, the federal regulation may well have provided relevant evidence as to what conduct would be reasonable under all the circumstances"). The MESA manual provides such a standard of care in this case, and the inspectors failed to perform their jobs at that level.

The negligence of the inspectors in failing to consider the consequences of the issuance of the Notice of Violation substantially increased the risk and made it almost inevitable that someone would be harmed by the dangerous junction box. Although the presence of the junction box and its condition were not affected by the Notice of Violation, the workers at the Ristokrat Mine were. The erection of the guardrail narrowed the gap between the junction box and the conveyor by at least four inches, to fourteen inches, thus making it more difficult to pass by the box without coming in contact with it. The railing also forced the workers to cease their practice of crossing over the conveyor at a point beyond the box and to walk past the box, and through the narrow gap, whenever they needed to go to the dust bin area.

The district court found, however, that the issuance of the Notice of Violation No. 53 was not a proximate cause of Donald Hylin's death. Under Illinois law, questions of proximate causation are questions of fact, *Ney v. Yellow Cab Co.,* 2 Ill.2d 74, 84, 117 N.E.2d 74 (1954); *Ray v. Cock Robin, Inc.,* 57 Ill.2d 15, 23, 309 N.E.2d 565 (1974); *Watson v. Chicago Transit Authority,* 12 Ill.App.3d 684, 692, 299 N.E.2d 58 (1st Dist. 1973); *Dooley v. Darling,* 26 Ill.App.3d 342,

354, 324 N.E.2d 684 (5th Dist.1975), and such determinations are therefore to be reviewed under the "clearly erroneous" standard of Fed.R.Civ.P. 52(a). Within the clearly erroneous standard, this court has enunciated a broad scope of review when the basic facts of the case are not in dispute. *City of Mishawaka, Indiana v. American Electric Power Co.,* 616 F.2d 976, 979 (7th Cir.1980); *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277, 1284 (7th Cir.1977); *Apolski's v. Concord Life Insurance Co.,* 445 F.2d 31, 34 (7th Cir.1969); *Yorke v. Iseri Produce Co.,* 418 F.2d 811, 814 (7th Cir. 1969). As we stated in *Yorke*

> When the factual determination is primarily a matter of drawing inferences from undisputed facts or determining their legal implications, appellate review is much broader than where disputed evidence and questions of credibility are involved.

*Id.* at 814. The facts in the present case are largely undisputed. The government presented no witnesses or exhibits. The credibility of the witnesses that did testify was not challenged and there were no inferences to be drawn from conflicting testimony. A substantial part of the record consisted of stipulation of fact and deposition testimony of the MESA employees. The only real dispute at the trial was the legal significance of the agreed upon occurrences. While we are not free to substitute our own judgment in the matter, we may reverse if, after a review of the evidence, "we are left with the definite and firm conviction that a mistake has been made." *Glenview Park District,* 540 F.2d at 1324. As to appellant's second claim, regarding the construction of the handrails, we have such a conviction.

The trial court's finding that the MESA inspectors' negligence in failing to consider the consequences of the issuance of a Notice of Violation for lack of handrails or emergency stop device on the conveyor belt was not the proximate cause of Donald Hylin's death seems to have turned on three determinations. The first was the drawing of a semantic distinction between a "barricade" which plaintiff alleged had been ordered and a "handrail or barrier" which was constructed. The second basis of the trial

court's finding was that the MESA inspectors did not order the installation of the handrail but left the operator of the mine with the option of installing either an emergency stop device or the handrail. And the third apparent basis, although explicitly mentioned by the trial court only in connection with the plaintiff's negligent inspection theory, was that the accident was due "entirely" to the company's negligent maintenance of the junction box rather than to any acts or omissions of the MESA inspectors. We shall address each ground.

First, whatever the definitional distinctions between "barricade," "barrier," and "handrail," one of the effects of the installation of the two-by-four device was clearly to prevent the workers from crossing the conveyor belt as they had prior to its construction. The MESA inspectors, Donald Johnson and John Guthrie, both testified that this was one purpose of the handrail. Any determination that the issuance of Notice of Violation No. 53 was not a proximate cause cannot be properly based on the semantic characterization of the device constructed by Ristokrat in response to the notice. It is clear that one purpose of the "handrail" or "barrier," and its major effect, was to prevent the workers from crossing the conveyor belt and to force them to walk down the left side of the belt and to pass by the faulty junction box.

The trial court's second and third determinations that led to its finding of no proximate cause were its finding that Notice of Violation No. 53 was not an order to construct the handrail but instead "was a report that noticed violations and allowed Ristokrat to elect how to abate those violations and the authorities at Ristokrat decided that the best way to do it was the erection of the handrail ..." and that, in any event, the true cause of the accident was the defective junction box, not the handrail order. But it is undisputed that Notice of Violation No. 53 left Ristokrat with a choice as to how to correct the violation. Ristokrat could have installed an emergency stop device or the handrail. But it is also undisputed that the emergency stop device was not feasible, given the nature of the mine's

continuous operation, and that the inspectors were aware of this fact. Ristokrat did not have the option of ignoring the Notice of Violation; to do so could lead to either criminal penalties or a debarment order closing the conveyor room. 30 U.S.C. § 727(b). MESA inspector Guthrie knew that Ristokrat's response to Notice of Violation No. 53 would be to install the handrails and that the result of this installation would be to redirect worker ingress through a narrow passageway past the junction box whose dangerous condition he observed. And on a follow-up spot inspection conducted on March 1, 1977, Guthrie observed, and his report reflected, that Ristokrat's response to the notice had been to erect the handrails. The trial court was correct in finding that Notice of Violation No. 53 was not an order to erect a barricade. But we feel compelled to respectfully express our view that the court erred in drawing certain conclusions from this finding.

The authorities at Ristokrat did "choose" to erect the handrail over the infeasible emergency stop device. Likewise, they chose to leave the junction box in its defective condition. These choices, however, do not amount to unforeseeable, independent and intervening causes which break the chain of causation from the inspectors' negligence to the subsequent death of Donald Hylin. Under Illinois law, proximate cause is that cause which, in natural or probable sequence, produces the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury. *Nelson v. Union Wire Rope Corp.,* 31 Ill.2d 69, 88, 199 N.E.2d 769 (1964); *Ray v. Cock Robin, Inc.,* 57 Ill.2d 19, 23, 310 N.E.2d 9 (1974); *Watson v. Chicago Transit Authority,* 12 Ill.App.3d 684, 692, 299 N.E.2d 58 (1st Dist.1973); I.P.I.2d, § 15.01 (1971). For our purposes, there are two important facets to Illinois' definition of proximate cause.

The first is that there may be more than one proximate cause of the injury. The fact that the owners of the Ristokrat Mine were also negligent in failing to keep the junction box in safe condition or that their negligence was "closer" to the injury, in that the junction box was the instrument of death, does not necessarily break any causal connection that may exist between the negligence of the MESA inspectors and the death of Donald Hylin. "It is ... well established [in Illinois] that where the concurrent negligence of two parties causes injury which would have been avoided but for the negligence of either, the negligence of each is the proximate cause of the injury." *Dooley v. Darling,* 26 Ill.App.3d 342, 354, 324 N.E.2d 684 (5th Dist.1975).

The second aspect of the Illinois definition of proximate cause is that liability extends to the injuries that are the natural and probable consequences of the negligence. The natural and probable consequences include any intervening cause which "the first wrongdoer might have reasonably anticipated ... as a natural and probable result of the first party's own negligence." *Merlo v. Public Service Co. of Northern Illinois,* 381 Ill. 300, 45 N.E.2d 665 (1943). "The intervention of independent, concurrent or intervening forces will not break the causal connection if the intervention of such independent force was itself probable and foreseeable." *Wintersteen v. National Cooperage and Woodenware Co.,* 361 Ill. 95, 197 N.E. 578 (1935). *See also Neering v. Illinois Central Railroad Co.,* 383 Ill. 366, 380–81, 50 N.E.2d 497 (1954); *Ney v. Yellow Cab Co.,* 2 Ill.2d 74, 79–81, 117 N.E.2d 74 (1943). Ristokrat's response to the Notice of Violation was not only probable and foreseeable but inspector John Guthrie left the mine knowing that the handrail would be installed and consequently that the workers would be forced to pass closely by the junction box whose dangerous and defective condition the inspectors observed. We thus believe that the trial court erred in determining that the issuance of Notice of Violation No. 53, without considering the consequences thereof, was not a proximate cause of Donald Hylin's death.

## CONCLUSION

For the foregoing reasons, we hold that a cause of action exists under the Federal

Tort Claims Act, 28 U.S.C. § 2671 *et seq.* for the negligent inspection of a mine, conducted under the authority of the Federal Metal and Nonmetallic Mine Safety Act, 30 U.S.C. § 721 *et seq.* (1971), when such negligent inspection increases the risk of harm to third persons. We reverse the trial court's finding that the negligence of the Mine Enforcement and Safety Administration inspectors was not the proximate cause of Donald Hylin's death, and remand for further proceedings consistent herewith.

REVERSED AND REMANDED.

BAUER, Circuit Judge, dissenting.

I do not agree that plaintiff's second theory of liability, that by their enforcement of mandatory safety standards requiring handrails the federal mine inspectors negligently enhanced the risk of injury from the defective junction box, states a cause of action under Illinois law. Therefore, I respectfully dissent.

The instrumentality of harm in this case, both before and after the handrails were installed, was the defective junction box. Thus, plaintiff's first theory of liability was premised on the federal inspectors' negligent failure to observe the hazard created by the junction box and to order the hazard abated. The district court denied recovery under this theory on the basis that the inspectors' failure to inspect and cite the defective junction box, even if negligent, was not the proximate cause of Hylin's death.

The majority concedes that plaintiff's theory of mere negligent failure to inspect the junction box and order correction is troublesome. Nonetheless, the majority imposes liability on the basis that the inspectors negligently enhanced the risk of injury from the defective junction box. I am not satisfied, however, that plaintiff's two theories are sufficiently different to allow this distinction.

The risk, if any, that arose from the inspectors' order that handrails be installed was not inherent in the handrails. Rather, the risk was that by reducing the free access past the junction box by four inches there was an increased probability that a worker would make physical contact with the defective junction box. And this risk, the risk of physical contact with the junction box, could only have been avoided by inspection and correction of the junction box itself.

Unlike the majority, I am unable to draw a bright line between "mere negligent failure to inspect the junction box and order correction," *ante* at 1210, and what I consider to be mere negligent failure to inspect the junction box in conjunction with its environs and order correction. Thus, under the circumstances of this case, I would find that plaintiff has failed to state a cause of action under Illinois law. Accordingly, I would hold that plaintiff's cause of action under the FTCA must likewise fail.