The National Cash Register Company, Appellant,
*v*. Haak, et al.

Argued June 12, 1974. Before WATKINS, P. J., JA-COBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*John Paul Kershner,* with him *Christopher W. Mattson,* and *Barley, Snyder, Cooper & Mueller,* for appellant.

*Robert L. Brabson,* with him *Windolph, Burkholder & Hartman,* for appellee, Eva L. Haak, Executrix.

*Alfred C. Alspach,* with him *Alspach & Ryder,* for appellee, S. Dale Kaufman.

OPINION BY SPAETH, J., March 31, 1975:

This is an appeal from the denial of appellant's motion to take off a compulsory nonsuit. In reviewing the record in such a case we must give appellant the benefit of all favorable evidence and reasonable inferences of fact. *Shirley v. Clark,* 441 Pa. 508, 271 A.2d 868 (1970) ; *Murray v. Siegal,* 413 Pa. 23, 195 A.2d 790 (1963). So viewed, the evidence is as follows.

In April of 1966, appellant, a manufacturing corporation, and appellees, a partnership of professional architects, entered into a contract by which appellees agreed

to provide architectural services for the design and construction of a manufacturing plant in Lancaster County. Pursuant to the contract, appellees submitted plans and specifications for the plant and appurtenant facilities, including a surface water disposal system. After some modifications, these were accepted by appellant. Prior to the submission of the plans and specifications, test borings had been made to determine the sub-surface condition of the site. The results of these tests revealed that the site was limestone and contained subterranean cavities. After obtaining these results, appellees ordered another set of test borings, and the results of these were substantially the same.

The approved plans called for a surface water disposal system consisting of clusters of dry wells[1] to which water was directed via underground pipes. Construction began in early 1967. However, in the spring of that year a large sinkhole[2] appeared to the rear of the building under construction. This sinkhole was repaired by excavating all the soil around it to locate the points where water and soil were flowing into the limestone, these points then being plugged with concrete. Construction was completed in the spring of 1968. At that time no more sinkholes had appeared.

Sinkholes did begin to appear again in September, 1968, after the plant was occupied. These sinkholes were generally located adjacent to the dry wells, and some were quite severe. On the advice of appellees the major ones were repaired as the first one had been. When sinkholes continued to appear, appellant hired the engineering firm of Gannett, Fleming, Corddry and Carpenter,

---

1. According to the testimony, a dry well is a large hole embedded in the ground, with porous sides, where water is collected and dissipated into the surrounding soil.

2. According to the experts who testified, a sinkhole is a collapse of the surface of the ground caused by erosion of the underlying rock.

Inc. Gannett-Fleming submitted a report stating that the dry wells were causing and aggravating the sinkhole activity, that this activity would become progressively worse, that the integrity of the building was threatened, and that the only practical remedy was to abandon the dry well system and design and install a new system that would remove the surface water by diverting it to ponds from which it would be pumped off the premises. Since the building was threatened, and since none of the engineers consulted by appellant recommended continued use of the dry wells, this new system was, despite considerable expense, installed.

Appellant commenced this action in trespass against appellees in March, 1971. Appellant alleged *inter alia* that appellees were negligent in deciding to use dry wells, and that appellant "relied on [appellees'] professional skill and judgment to design a system that was fit for the disposal of surface waters in a manner which would not endanger the lives and safety of persons and property." The case proceeded to trial, at which the facts as stated here were adduced. The controversy on this appeal centers around the adequacy of the testimony of the four expert witnesses called by appellant.

Charles W. Pickering was admitted as an expert in "civil engineering in hydraulics" (the court's characterization) or as a "civil engineer familiar with hydraulics" (defense counsel's characterization). He was employed by Gannett-Fleming and was the one who had examined the site for that firm and had recommended the removal of the dry wells and the installation of the new system. His opinion on the cause of the sinkhole activity was unequivocal:

> "It is my opinion that the Surface Water System as was installed on the NCR site has accelerated the formation of sinkhole activity on the site.
>
> "[I]f the present system were to be continued in use, . . . the formation of sinkholes would continue

and with the ultimate possibility or ultimate meaning at sometime, some point in time, because it is a natural phenominal [sic] it cannot be predicted, that at sometime there may be serious damage caused to the major facilities on the site.

Q. Would that include the building?

A. Yes."

Timothy Saylor was admitted as an expert in geology. He was also employed by Gannett-Fleming, and his testimony, where relevant to the issues to be considered here, corroborated Mr. Pickering's.

Professor Jacob Freedman of Franklin & Marshall College also testified as an expert in geology. His qualifications indicated extensive experience in his field covering over 25 years, including being frequently called in as a consultant on the geology of Lancaster County, especially with regard to "water problems, foundations problems, [and] studies of quarries." His testimony corroborated Mr. Pickering's and Mr. Saylor's with regard to the causal relationship between the dry wells and the sinkholes. He then added the following at the end of re-direct examination:

"I probably ought to say and I probably haven't said this in my discussion so far along these lines, that I have and I know no geologist who has ever recommended dry wells for construction in an area like this; that, in fact, we urge people not to use this kind of system; and if they have French drains—in fact, as I say, we frequently get calls at school; and any-time anybody mentions a French drain we tell them they are in for trouble, and french drains and dry wells are very similar in their properties. So these are systems that should not have been installed because they lead to trouble."

This brief statement (which was not given in direct response to any question, but which also was not objected to) was immediately explored on recross-examination:

"Q. This is your opinion, Professor, is that correct?

A. Let's say it is not only opinion. It is an observation.

Q. And I understand you to say that no geologist that you know of recommends this system for this type of area?

A. I know all my colleagues invade [*sic*; "inveigh"?] against them.

Q. These are all of your colleagues at Franklin & Marshall?

A. Everybody I have talked to.

Q. At Franklin & Marshall?

A. No, at other places too.

Q. Pardon me?

A. Other places, other colleagues. We discuss these at meetings and I have been a consultant on a situation where I have seen the result of one of these things."

That was the complete recross-examination of this witness.

Appellant's final witness was F. James Knight, a registered engineer, who was qualified as an "engineering geologist." He was employed by Gannett-Fleming and had supervised the repairs of the sinkholes on appellant's site. He testified as to the extent of the damage and the extent of the repairs necessary, and expressed his professional opinion that the dry wells had "contributed significantly to the accelerated formation of sinkholes . . . on that tract."

At the close of appellant's case an oral motion for compulsory nonsuit was made on the ground that appellant had failed to present sufficient expert testimony to establish the standard of care required of an architect in that locality with respect to the design of surface water disposal systems. The court granted the motion, ruling that "while [appellant] has presented testimony of experts in the field of geology and engineering, they

have not presented any testimony in the field of architecture tending to prove that [appellees'] professional services departed from accepted practice in this profession or that [appellees] failed to meet the standards of their professional duties." A motion to take off the nonsuit was denied by the court *en banc* with an opinion by Judge BUCHER, who was also the trial judge. In that opinion the court held that "testimony in the field of architecture" was necessary. It also suggested a second reason for the nonsuit, by asking, "[D]id [appellant] prove any negligence on the part of [appellees] that justified submitting the case to the jury?"[3] Both of these issues are before us on this appeal.

## I

The failure to present an architect as an expert witness was not fatal to appellant's case.

The court below states the general rule as being that "expert testimony is necessary to establish negligent practice in any profession." *Wohlert v. Seibert*, 23 Pa. Superior Ct. 213 (1903), is cited for this proposition (as it has been in other opinions),[4] but in fact its test is more analytical:

> "The crucial test of the competency of a witness offered as an expert to give testimony as such is the resolution of the question as to whether or not the jury or persons in general who are inexperienced in or unacquainted with the particular subject of inquiry would without the assistance of one who possesses a knowledge be capable of forming a correct judgment upon it." *Id.* at 216.

---

3. See the Act of March 11, 1875, P.L. 6, § 1, as amended June 3, 1971, P.L. 118, No. 6, § 1 (§ 509 (a) (25)), 12 P.S. § 645 (Supp. 1974-75).

4. *See, e.g., Robinson v. Wirts*, 387 Pa. 291, 295, 127 A.2d 706, 708 (1956); *Powell v. Risser*, 375 Pa. 60, 65, 99 A.2d 454, 456 (1953); *Bierstein v. Whitman*, 360 Pa. 537, 541, 62 A.2d 843, 845 (1949).

The opinion then goes on to restate the rules for the standard of care to which a physician is held; it does not discuss any other profession or professions in general. The same observation may be made of the section of Wigmore most cited on professional experts:

"On any and every topic, only a qualified witness can be received; and where the topic requires special experience, only a person of that special experience will be received [cross reference omitted]. If therefore a topic requiring such special experience happens to form a main issue in the case, the evidence on that issue *must* contain expert testimony, or it will not suffice." Wigmore on Evidence (3d ed. 1940) §2090(a) at 453.

We have no doubt that expert testimony was required in this case. The "subject of inquiry" was the standard to be applied to one who holds himself out as competent to design and supervise the construction of a surface water disposal system in Lancaster County. This is certainly a subject that "requires special experience." However, there is nothing inherent in the nature of that experience that makes it unique to architects. What the jury needed was not "the assistance of one who possesses a knowledge" of architecture but of surface water disposal systems. Whether the person offering that assistance happened to be an architect, or engineer, or geologist, or something else, was unimportant; what was important was what he knew.

The error committed by the court below was that it literally analogized the instant case to one of medical malpractice. The court reasoned that in medical malpractice cases there must be expert testimony from physicians as to the appropriate standards of medical practice. From this the court reasoned that in a suit against architects, only architects are competent to testify as to the appropriate architectural standards. However, in medical malpractice cases the expert generally must be

a physician because only a physician is trained to perform the medical functions that are the subject matter in controversy. In the instant case the subject matter in controversy (the design and installation of a surface water disposal system on the site in question) is not within the exclusive realm of one profession. To the contrary, it is within the realm of at least three professions: architects, engineers, and geologists. Therefore, a member of any of these professions (if otherwise qualified) was competent to state what the appropriate design and installation standards were.

A case similar to this one is *Bloomsburg Mills, Inc. v. Sordoni Construction Co.,* 401 Pa. 358, 164 A.2d 201 (1960). There the plaintiff hired some architects to design and supervise the construction of a weaving mill for nylon and rayon. This type of manufacturing requires a constant temperature and humidity. It was thus necessary to build the roof with a "vapor seal" to prevent condensation and leakage of moisture. The plaintiff alleged that the roof was defective in that the vapor seal did not function properly, and that the roof was otherwise inadequately sealed. The defendant appealed a verdict in favor of the plaintiff, claiming insufficient evidence of negligence. As part of this claim the defendant attacked the competency of the plaintiff's expert witness. The expert had had extensive experience with a large roofing manufacturing company and was at the time of the trial a professional roofing consultant. (He had, in fact, been requested by the defendants to submit a bid on the project in question but had declined.) He was not, however, an architect. Nevertheless the Supreme Court held him qualified to testify against the defendant architects. For other decisions in accord, *see Abbott v. Steel City Piping Co.,* 437 Pa. 412, 263 A.2d 881 (1970) (witness with extensive experience in masonry competent to testify as to how a certain wall should be built despite

lack of formal engineering degree); *Willner v. Woodward,* 201 Va. 104, 109 S.E. 2d 132 (1959) (heating engineer competent to testify against architect regarding a heating and air conditioning duct); *Cuttino v. Mimms,* 98 Ga. App. 198, 105 S.E. 2d 343 (1958) (engineer and contractor both competent to testify against architect in case based on faulty construction); *Covil v. Robert & Company Associates,* 112 Ga. App. 163, 144 S.E.2d 450 (1965) (engineer competent to testify against architect who had drawn plans for water works where issue was whether a certain pipe joint was properly secured).

The court below dismissed *Bloomsburg Mills,* saying that the improper design of a roof is a "common problem" that "would hardly require expert testimony." As suggested by our preceding statement, however, in fact the problem was quite complex and involved a special type of structure. This is further apparent from the Supreme Court's quite lengthy and detailed discussion of the construction problems presented, and of the expert witness's qualifications, none of which would have been appropriate had the case presented only a "common problem," requiring no expert testimony at all.[5] We thus find *Bloomsburg Mills* persuasive authority, and conclude that the failure of appellant to present an architect as an expert witness was not fatal to its case.

---

5. The court below also cited *Nauman v. Harold K. Beecher & Associates,* 24 Utah 2d 172, 467 P.2d 610 (1970), and *Paxton v. Alameida County,* 119 Cal. App. 2d 393, 259 P.2d 934 (1953). The former merely restates the general rules for deciding an architect's negligence; in the latter the plaintiff's expert was an architect, but the court found the testimony of the defendant's experts (also architects) to be entitled to more weight, and the judgment against the defendant was therefore reversed. Neither of these cases supports the proposition that in a suit against an architect in his professional capacity, the testimony of another architect is essential.

II

Although, as noted above, the opinion of the court below asks the question, "[D]id [appellant] prove any negligence . . . that justified submitting the case to the jury?", in fact that question is not there addressed. Instead, the entire opinion deals only with whether the trial judge was correct in holding that in an action against an architect acting in his professional capacity, the plaintiff must produce testimony by another architect, which is the issue that we have just disposed of. In these circumstances we have made our own examination of the record, and have concluded that appellant did prove sufficient evidence of negligence to send the case to the jury.

Messrs. Pickering, Saylor, and Knight all testified unequivocally that in their respective professional opinions the sinkholes were aggravated by the dry well system, and that considerable damage to appellant's property resulted. However, none of them testified as to the standards of skill required of one who undertakes to design and supervise the installation of a surface water disposal system in the particular area in question, and, as observed in the preceding section of this opinion, it was essential to appellant's case that there be some testimony by a qualified expert on that point.

Appellees have contended that there was no such testimony. (They do not challenge the testimony of Messrs. Pickering, Saylor, and Knight.) This contention, however, overlooks the testimony of Professor Freedman, which we have already quoted in relevant part, *ante* at 567. It is indeed true that Professor Freedman's testimony was not developed in an orderly manner, and in fact it appears to have emerged almost by chance.[6] It is, nevertheless, in the record, and the professor was cross-

---

6. For a suggested procedure, *see* 24 Am. Jur. Proof of Facts, Architect's Negligence §12, at 308-311, which is apparently modeled on *Bloomsburg Mills, Inc. v. Sordoni Const. Co., supra.*

574

examined with respect to it. Summarized, the testimony was that neither the professor, nor any other geologist, nor any one consulted about surface water disposal, "has ever recommended dry wells for construction in an area like this . . . [W]e frequently get calls . . . and . . . we tell them they are in for trouble . . . [T]hese are systems that should not have been installed because they lead to trouble." When we bear in mind that we must give appellant every reasonable benefit from the evidence, *Shirley v. Clark, supra,* this testimony may fairly be read as a statement of opinion, by a qualified expert, that appellants violated the professional standards of care to which they were obliged to conform.

Order reversed.