ROSOS LITHO SUPPLY CORPORATION, Plaintiff-Appellee and Cross-Appellant, *v.* RICHARD T. HANSEN, Defendant-Appellant and Cross-Appellee.

First District (2nd Division)   No. 82—2240

Opinion filed March 13, 1984.—Modified on denial of rehearing April 17, 1984.

Steven G.M. Stein and Paul Cottrell, both of Fohrman, Lurie, Sklar & Simon, Ltd., of Chicago, for appellant.

Canel, Aronson & Whitted and Stone, Pogrund & Korey, both of Chicago (Richard J. Aronson and Martin S. Korey, of counsel), for appellee.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

A jury found defendant Richard T. Hansen (Hansen), a licensed architect, and two other defendants guilty of negligence in the construction of a building addition commissioned by its owner, plaintiff Rosos Litho Supply Corporation (Rosos). The jury also found that Hansen had not breached his contract with Rosos. Judgment was entered on the verdict and alternative post-trial motions for judgment notwithstanding the verdict, for a remittitur, or for a new trial, were denied. Of defendants, only Hansen appeals. Rosos cross-appeals.

The issues raised on appeal and cross-appeal are whether: (1) recovery of economic loss is prohibited in a negligence action against an architect; (2) the standard of care for an architect was sufficiently established and the breach of this standard proven; (3) the jury considered the proper measures of damages; and (4) the jury was authorized to apportion defendants' liability.

On July 2, 1973, Rosos entered into a written contract with Hansen, who agreed to design and supervise construction of a storage building addition to Rosos' existing structure in Lake Bluff, Illinois. The addition was to have a concrete floor of 33,000 square feet, divided into 40 feet by 40 feet bays, to match similar bays in the existing structure. Hansen recommended to Rosos that the 40 feet by 40 feet slabs be saw cut to reduce cracking and keep the water in the concrete to a minimum. Rosos chose not to do so.

Rosos acted as its own general contractor. Hansen wrote separate specifications for each of the trades involved in the construction. Rosos contracted with Herky Trucking, Inc. (Herky), on May 28, 1974, for excavating the foundation, and layering and compacting the fill in preparation for laying the concrete floor. On August 7, 1974, Rosos contracted with Drake Construction Company (Drake) to construct the concrete floor, among other things. Herky completed its foundation work in October 1974. The fill was then ready for the concrete; however, the roof had to be completed first, and Drake did not begin pouring concrete until January 28, 1975. The prepared fill was exposed for about three months. During that time, in December 1974, snow cleared from the roof under construction was shoveled through open skylights onto the exposed fill, where it remained piled for a time before being cleared by Drake.

After the addition was built, numerous cracks developed in the concrete floor. Slab displacement resulted in height disparities of as much as three-quarters of an inch at slab junctures, making it difficult to maneuver forklift trucks and other equipment over the floor. On November 19, 1976, Rosos filed a complaint against Hansen, Herky, and Drake, with counts sounding in contract and warranty breaches, and in negligence. On March 11, 1977, Hansen filed a counterclaim for the balance due on his fee. Summary judgment was awarded to Hansen on Rosos' warranty count on November 10, 1977.

At trial, beginning on May 19, 1982, Hansen described the terms of his standard American Institute of Architects contract with Rosos. Under specifications written by Hansen, the excavator was to hire a soil engineer, to be paid by the owner if necessary, to test each layer of fill as it was put in and to make daily reports to Hansen. A soil test was made between the middle of September and early October 1974, when excavator Herky had put in only three-quarters of the fill. A preliminary field test revealed compliance with the 95% minimum compaction required by the specifications; however, a follow-up laboratory report showed that three of five soil samples fell below the requisite figure. By letter, Hansen advised Herky of the low compaction. Herky assured him the problem would be remedied. No further tests were made by a soil engineer, nor did Hansen order any, although Hansen had become aware in December 1974 that there was frost in the fill. The project specifications required Hansen to approve the soil before any concrete was laid, but Drake already was pouring concrete when Hansen arrived on the job on January 28, 1975. Drake told Hansen the soil had been tested and no frost found in those holes that had been dug. Drake's test of the fill in January was not made by a

soil engineer.

Herky's president, Jack Herchenbach, testified that his contract with Rosos called for Herky to employ a soil engineer. No tests were ordered between October 1974 and January 1975, however. Edward Paramsky, co-owner of Drake, testified that Hansen asked him to check for frost in the fill, which Paramsky observed on January 6, 1975. He later dug some holes and determined the fill to be frost free.

A series of experts, including structural engineers, architects, and a petrographer-geologist, testified on behalf of Rosos and various defendants. They attributed the defects in the concrete to various causes: settlement of the subgrade at different levels due to "frost in the fill," caused by excess moisture in the soil which, in turn, may have resulted from snow being piled onto the fill; insufficient soil compaction; concrete shrinkage due to either excess water in the concrete mixture or failure to apply a curing compound to the drying concrete; and differential shrinkage of the top and bottom surfaces of the slabs. These experts recommended remedial measures, most commonly "cement grouting," whereby material is inserted into the voids beneath the slabs through holes drilled into the concrete, cracks are filled with epoxy, and slab edges are ground level. A structural engineer testified for Rosos that because the success of such repair could not be assured, tearing out all the slabs and replacing them entirely was an alternative.

In its findings, the jury awarded Rosos $115,000 on its negligence claim and found for defendants and against Rosos on the contract claim. Although construction was completed in 1975, over defendants' objection the jury was given verdict forms based upon contribution among defendants. The relative fault assigned to defendants was 10% to Hansen, 60% to Drake and 30% to Herky. Hansen was awarded $1,709.84 on his counterclaim against Rosos, and Hansen was found not entitled to indemnification from the other defendants. Judgment was entered on the verdicts on June 14, 1982.

I

■ Hansen contends the economic damages assessed against him are not recoverable in a negligence action under Illinois law. Rosos responds that Hansen waived this argument because he failed to raise it until his post-trial motion. Rosos' tort action seeking economic damages from Hansen was contained in count III of its complaint. Although Hansen had not previously moved to strike count III, his post-trial motion challenged Rosos' right to pursue this action in light of the recent supreme court decision in *Moorman Manufacturing Co. v.*

*National Tank Co.* (1982), 91 Ill. 2d 69, 435 N.E.2d 443 (*Moorman*). Defects in a complaint such as an insufficient statement of an otherwise cognizable cause of action may be waived; however, the question of whether a legal foundation for a complaint exists may be raised at any time. (*Wagner v. Kepler* (1951), 411 Ill. 368, 371, 104 N.E.2d 231; *Dunlap v. Marshall Field & Co.* (1975), 27 Ill. App. 3d 628, 633, 327 N.E.2d 16; *Watson v. Chicago Transit Authority* (1973), 12 Ill. App. 3d 684, 688, 299 N.E.2d 58.) Under the foregoing authorities, no waiver is applicable to the instant circumstances. Although thus properly before this court, Hansen's contention nevertheless must be rejected on its merits as inapplicable to professional services involved here.

When defects in a product are "of a qualitative nature and the harm relates to the consumer's expectation that a product is of a particular quality *** contract, rather than tort [whether sounding in strict liability or negligence], law provides the appropriate set of rules for recovery." (*Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 88.) Damages are denominated "economic" where they involve defects in the product itself, requiring repair or replacement. (91 Ill. 2d 69, 82.) Excluded from such damages are personal injury or damage to other property, and defects caused by a sudden and dangerous occurrence rather than deterioration. *Foxcroft Townhome Owners Association v. Hoffman Rosner Corp.* (1983), 96 Ill. 2d 150, 156, 449 N.E.2d 125; *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 82-83; *Vaughn v. General Motors Corp.* (1983), 118 Ill. App. 3d 201, 203-04, 454 N.E.2d 740.[1]

Hansen principally relies on *Moorman* to support his argument that economic loss is not recoverable in a case such as this. There, plaintiff sought recovery for economic loss under tort theories of strict liability, negligence, and misrepresentation as the result of defects in a grain storage tank manufactured and sold by defendant. The supreme court held that these tort theories could not support plaintiff's claim for mere economic loss, premised on the availability to plaintiff of a warranty remedy, primarily by invoking the Uniform Commercial Code (UCC). (Ill. Rev. Stat. 1981, ch. 26, par. 1—101 *et seq.*) The court repeatedly emphasized that permitting recovery for economic loss would usurp the remedial scheme of the UCC. (*Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 79, 88,

---

[1]An excellent discussion of the applications of these definitions and their potential disadvantages appears in Bertschy, *The Economic Loss Doctrine in Illinois After Moorman*, 71 Ill. B.J. 346 (1983).

90, 91.) Warranty, not tort, specifically addresses a consumer's expectations regarding a product's suitability and quality. 91 Ill. 2d 69, 82.

Hansen maintains that *Moorman* represents a philosophical statement about the limits of tort and contract law and accordingly urges that it be read expansively to preclude Rosos' recovery in the instant case. He contends that an architect's contractual duties encompass not only those expressed in the contract, but many arising *ex lege* from the relationship created by the contract. (See *Board of Education v. Del Bianco & Associates, Inc.* (1978), 57 Ill. App. 3d 302, 308, 372 N.E.2d 953.) As a result, Hansen concludes Rosos must be limited to its remedy for loss on its contract claim. We disagree.

Among the reasons architects have been found answerable in malpractice actions is because they hold themselves out and offer services to the public as experts in their line of endeavor. Those who employ them perceive their skills and abilities to rise above the levels possessed by ordinary laymen. Such persons have the right to expect that architects, as other professionals, possess a standard minimum of special knowledge and ability, will exercise that degree of care and skill as may be reasonable under the circumstances and, when they fail to do so, that they will be subject to damage' actions for professional negligence, as are other professionals. (See, *e.g.*, Prosser, Torts sec. 32, at 161-62 (4th ed. 1971); Block, *As the Walls Came Tumbling Down: Architects' Expanded Liability*, 17 J. Mar. L. Rev. 1 (1984); *Kleb v. Wendling* (1978), 67 Ill. App. 3d 1016, 1019-20, 385 N.E.2d 346, *appeal denied* (1979), 75 Ill. 2d 591.) The broad reading of *Moorman* urged by Hansen in the instant case would, simply by inference, effectively eliminate and stand squarely in conflict with the body of law defining the scope of an architect's liability for professional negligence. See, *e.g., Mississippi Meadows, Inc. v. Hodson* (1973), 13 Ill. App. 3d 24, 299 N.E.2d 359, *appeal denied* (1973), 54 Ill. 2d 597; *Miller v. DeWitt* (1965), 59 Ill. App. 2d 38, 208 N.E.2d 249, *aff'd in part, rev'd in part on other grounds* (1967), 37 Ill. 2d 273 (general discussion of duty); *530 East 89 Corp. v. Unger* (1977), 43 N.Y.2d 776, 402 N.Y.S.2d 382, 373 N.E.2d 276; *A. R. Moyer, Inc. v. Graham* (Fla. 1973), 285 So. 2d 397; *Willner v. Woodward* (1959), 201 Va. 104, 109 S.E.2d 132; *United States for use of Los Angeles Testing Laboratory v. Rogers & Rogers* (S.D. Cal. 1958), 161 F. Supp. 132; Annot., 65 A.L.R.3d 249 (1975).

Such an extended reading of *Moorman* would also cast aside, by inference, the previously recognized measure of damages in architectural malpractice cases, which has been the cost of repairing the defective structure. (See, *e.g., Society of Mount Carmel v. Fox* (1980),

90 Ill. App. 3d 537, 413 N.E.2d 480; *Barraque v. Neff* (1942), 202 La. 360, 11 So. 2d 697; *Trunk & Gordon v. Clark* (1914), 163 Iowa 620, 145 N.W. 277.) If the defect is so fundamental or widespread that it cannot be ameliorated without extensive repairs and expense, then the proper measure of damages has been the difference in value between the building as it stands and its putative value if the architectural services had been satisfactory. See, *e.g., Park v. Sohn* (1982), 89 Ill. 2d 453, 464-65, 433 N.E.2d 651; *Brewer v. Custom Builders Corp.* (1976), 42 Ill. App. 3d 668, 674, 356 N.E.2d 565. See generally 5 Am. Jur. 2d *Architects* sec. 24 (1962); Annot., 25 A.L.R.2d 1085, 1100 (1952).

Furthermore, since the UCC is inapplicable to the provision of professional services such as those rendered by Hansen, Rosos has no warranty remedy for economic loss against him for damages. (See *Pitler v. Michael Reese Hospital* (1980), 92 Ill. App. 3d 739, 741-42, 415 N.E.2d 1255; *Rosen v. DePorter-Butterworth Tours, Inc.* (1978), 62 Ill. App. 3d 762, 764, 379 N.E.2d 407.) Nor is there any other implied common law or statutory warranty applicable to an architect's services. (See *Sears, Roebuck & Co. v. Enco Associates, Inc.* (1977), 43 N.Y.2d 389, 398, 401 N.Y.S.2d 767, 772, 372 N.E.2d 555, 559.) In Illinois "in the absence of a special agreement [the architect] does not imply or guarantee a perfect plan or satisfactory result." (*Mississippi Meadows, Inc. v. Hodson* (1973), 13 Ill. App. 3d 24, 26.) The absence of implied warranties in architects' services makes it possible for an architect to effectively insulate himself from liability by *omitting* certain express warranty terms from his contract. In contrast, the UCC's implied warranties of merchantability and fitness cannot be waived contractually except by *including* a conspicuous writing to that effect. (Ill. Rev. Stat. 1981, ch. 26, par. 2—316(2).) The UCC policy of protecting consumers by means of implied warranties would not be promoted by depriving Rosos of a viable cause of action for economic loss.

The circumstances presented here are concerned with the rendering of professional services, not with products (see *Lowrie v. City of Evanston* (1977), 50 Ill. App. 3d 376, 365 N.E.2d 923, *appeal denied* (1977), 66 Ill. 2d 631; *cf. Schipper v. Levitt & Sons, Inc.* (1965), 44 N.J. 70, 207 A.2d 314), and are analogous to negligence actions in Illinois against professionals who provide services similar to architects. For example, in *Bates & Rogers Construction Corp. v. North Shore Sanitary District* (1980), 92 Ill. App. 3d 90, 414 N.E.2d 1274, engineers were found guilty of professional negligence in their design of electrical switch gear and negligent administration of their duties un-

der a contract. The appellate court, in affirming the judgment, specifically approved the award of economic damages in such cases, and distinguished the rule precluding recovery of purely economic losses announced in *Alfred N. Koplin & Co. v. Chrysler Corp.* (1977), 49 Ill. App. 3d 194, 203, 364 N.E.2d 100, from design malpractice cases. A supervising engineering company was held answerable for economic losses attributed to its allegedly negligent design of a manhole base and its administration of the construction contract in *W. H. Lyman Construction Co. v. Village of Gurnee* (1980), 84 Ill. App. 3d 28, 403 N.E.2d 1325, *appeal denied* (1980), 81 Ill. 2d 600. And in *Normoyle-Berg & Associates, Inc. v. Village of Deer Creek* (1976), 39 Ill. App. 3d 744, 350 N.E.2d 559, an engineer was held chargeable for economic injury in a negligence action for failure to complete certain plans and failure to properly supervise a construction project. See also *Gateway Erectors Division of Imoco-Gateway Corp. v. Lutheran General Hospital* (1981), 102 Ill. App. 3d 300, 430 N.E.2d 20, *appeal denied* (1982), 91 Ill. 2d 552.

Hansen relies upon *Palatine National Bank v. Charles W. Greengard Associates, Inc.* (1983), 119 Ill. App. 3d 376, 456 N.E.2d 635, in which the second district appellate court upheld the dismissal of professional engineering negligence counts seeking damages for economic losses, relying upon *Moorman*. The court in *Palatine National Bank* makes no attempt to distinguish between professional services negligently rendered and defective products, the latter of which was the subject of *Moorman*. The authorities it cites in support of its conclusion are exclusively products liability cases. Accordingly, we decline to follow that decision.

◼ We do not read *Moorman* as having abolished by inference all professional malpractice actions charging economic losses, arising from service contracts, based upon negligent violation of professional standards of care and skill. Such a significant departure from established law, which would affect not only architects' malpractice, but similar actions against other professionals, should be signalled expressly by the supreme court itself. Significantly, in a case similar to the present one, *Cooper v. Jevne* (1976), 56 Cal. App. 3d 860, 128 Cal. Rptr. 724, architects who drew construction plans and specifications and acted as supervising architects under written contracts were charged with professional malpractice. The architects contended that they were not answerable for economic damages alone in a negligence action, relying upon *Seely v. White Motor Co.* (1965), 63 Cal. 2d 9, 403 P.2d 145, 45 Cal. Rptr. 17, a case extensively cited and relied upon by our own supreme court in reaching its result in *Moorman*

*Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 75, 77, 78, 79, 80, 81, 82, 86, 88. In distinguishing *Seely*, the court in *Cooper* observed:

> "Unfortunately for the architects, the liability at issue in this case is the malpractice liability of a professional for negligence in the rendition of his services and not that of a manufacturer for defects in his product." (*Cooper v. Jeune* (1976), 56 Cal. App. 3d 860, 868, 128 Cal. Rptr. 724, 728.)

Our own analysis of the law is in harmony with the foregoing and we hold that economic loss occasioned by an architect's negligent performance of his professional duties is recoverable in an action in tort. See also *Ferentchak v. Village of Frankfort* (1984), 121 Ill. App. 3d 599.

Hansen also contends that because the *Moorman* rule has been applied to building contractors who render "construction services," it should be extended to architects providing such services. The cases relied upon by Hansen, however, are distinguishable, namely, *Foxcroft Townhome Owners Association v. Hoffman Rosner Corp.* (1983), 96 Ill. 2d 150, 449 N.E.2d 125, *Redarowicz v. Ohlendorf* (1982), 92 Ill. 2d 171, 441 N.E.2d 324, and *Altevogt v. Brinkoetter* (1981), 85 Ill. 2d 44, 421 N.E.2d 182. The first two cases involved builders who constructed homes containing defects and the third involved an alleged breach of a warranty of habitability, unlike the solely professional services rendered in the present case. (*Cf. Flintkote Co. v. Dravo Corp.* (11th Cir. 1982), 678 F.2d 942.) Similarly, Illinois cases preceding *Moorman* which held economic loss not recoverable in tort involved buyer-seller relationships where, unless waived, some form of implied warranty existed, unlike the circumstances present here. *Fireman's Fund American Insurance Cos. v. Burns Electronic Security Services, Inc.* (1980), 93 Ill. App. 3d 298, 417 N.E.2d 131; *Album Graphics, Inc. v. Beatrice Foods Co.* (1980), 87 Ill. App. 3d 338, 408 N.E.2d 1041; *Alfred N. Koplin & Co. v. Chrysler Corp.* (1977), 49 Ill. App. 3d 194.

## II

■ Error is next urged by Hansen in Rosos' asserted failure to establish both the standard of care by which his professional actions could be evaluated by the jury and the breach of this standard. According to *Mississippi Meadows, Inc. v. Hodson* (1973), 13 Ill. App. 3d 24, 26, cited by both parties, an architect "is tested by the rule of ordinary and reasonable skill usually exercised by one in that profession." This was essentially the standard presented to the instant jury

in its instructions. Analogizing to cases involving the negligence of physicians and attorneys, Hansen argues that this standard can be established only be expert testimony, which Rosos failed to present. (See, *e.g., Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279; *Brown v. Gitlin* (1974), 19 Ill. App. 3d 1018, 313 N.E.2d 180.) In the absence of Illinois cases directly in point, Hansen refers to other jurisdictions requiring such testimony. (See *530 East 89 Corp. v. Unger* (1977), 43 N.Y.2d 776, 402 N.Y.S.2d 382, 373 N.E.2d 276; *National Cash Register Co. v. Haak* (1975), 233 Pa. Super. 562, 335 A.2d 407.) Illinois decisions, however, have held that an architect's tort duty can also be defined by reference to his particular employment agreement. (*Bates & Rogers Construction Corp. v. North Shore Sanitary District* (1980), 92 Ill. App. 3d 90, 414 N.E.2d 1274; *Mississippi Meadows, Inc. v. Hodson* (1973), 13 Ill. App. 3d 24.) Notwithstanding the foregoing, the record demonstrates that the standard of care applicable to Hansen in the instant circumstances was sufficiently established at trial.

By contract, Hansen agreed to: Oversee the quality and quantity of the various contractors' work; accept full authority to require that any work not meeting project specifications be remedied; receive daily reports of a soil engineer to be hired by the excavator; and hire a soil engineer where he deemed it necessary. The services of a soil engineer were thereby inferably significant to the success of the project, and the ultimate responsibility of assuring the participation of such an engineer rested with Hansen. This responsibility was underscored by expert witnesses. An architect testified that, because of the ongoing compaction requirements in the project specifications, a full-time soil engineer should have been retained. A structural engineer testified that daily testing by a soil engineer was "very important" because of the negative consequences of inadequate compaction. Hansen's duty of care with respect to the hiring and use of a soil engineer was sufficiently established by this evidence.

█ Evidence of Hansen's breach of duty was likewise supported by expert testimony. Although the experts' opinions conflicted regarding the causes of the damage to the concrete, the weight to be accorded this evidence was for the jury to decide. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 424, 328 N.E.2d 301.) Evidence submitted to the jury here suggested that two factors contributing to the damage were inadequate compaction and frost in the fill, both of which could have been diagnosed and the ensuing damage prevented by a soil engineer's daily testing. Hansen himself testified that he ordered no soil tests from the time the fill was three-quarters completed

until the concrete was poured, some three months later. He also said he observed the piles of snow on the fill, considered by one expert to be a cause of excess moisture resulting in frost in the fill. The jury could have inferred from Hansen's own testimony that he was on notice of possible compaction or frost problems; that he was thereby required to have the soil tested by an expert; and that his failure to do so violated the standards of his profession. We find no error in this regard.

## III

Hansen insists that Rosos failed to prove its damages properly and that the award of $115,000 cannot stand. Generally, plaintiff has the burden of proving his damages to a reasonable degree of certainty; direct and tangible proof must be offered where damages can be reduced to monetary terms; and, conversely, evidence of damages may not be remote, speculative, or uncertain. (*Sheetz v. Morgan* (1981), 98 Ill. App. 3d 794, 801, 424 N.E.2d 867.) Where a party fulfills his burden of proving his right to damages, but fails to establish a proper basis for computing those damages, only nominal damages can be recovered. *Brewer v. Custom Builders Corp.* (1976), 42 Ill. App. 3d 668, 678, 356 N.E.2d 565.

In the instant case, considerable testimony was adduced with regard to the extensive cracking and displacement of the concrete slabs, that such damage was beyond acceptable limits, and that the use of the addition for its intended purposes was impaired because of the condition of the floor. Witnesses, testifying for both plaintiff and defendants, recommended some type of repair, including overlaying with a new floor, but most often "cement grouting." One witness suggested removing and replacing the damaged slabs at a cost of $125,000, as an alternative to grouting repair. Although there was no testimony as to the necessity of total replacement, an architect and engineer testified for Rosos that the cost of tearing out the concrete and fill, demolishing walls, and then replacing the fill, concrete and walls, exclusive of his fee, totalled $228,935. An engineer specializing in remedial work on concrete slabs testified in rebuttal that "cement grouting" is routinely and successfully done and the cost of repairs would be $30,800, although he conceded on cross-examination that at 1982 prices his 1977 estimate would have to be increased by 40%. Evidence supporting Rosos' cost of correcting the defects was thus presented to the jury. (See *Frisch Contracting Service Corp. v. Northern Illinois Gas Co.* (1981), 93 Ill. App. 3d 799, 804-05, 417 N.E.2d 1070.) The jury could have found that Rosos, having fulfilled its burden of

establishing a basis for computing damages, was entitled to more than nominal damages. The jury for the same reason was not obliged to rely on Hansen's repair estimate.

■ In its cross-appeal, Rosos assigns error to the circuit court's exclusion of expert testimony which would have shown the amount by which the defective construction diminished in value the building addition. As previously indicated, some evidence was adduced that replacement would be proper; moreover, Rosos' proposed "repair" involved extensive demolition of the existing structure. The circuit court, however, sustained Hansen's motion *in limine* to exclude testimony as to diminution in value, indispensable to an equitable resolution of the instant damages. Where a proposed repair requires a substantial tearing down and rebuilding of the structure, or where the cost of the repair is disproportionate to the benefit to plaintiff, the correct measure of damages is the amount by which the defective construction reduces the value of the property, unless this latter amount exceeds the former. (*Park v. Sohn* (1982), 89 Ill. 2d 453, 464-65; *Mayfield v. Swafford* (1982), 106 Ill. App. 3d 610, 616, 435 N.E.2d 953; *Brewer v. Custom Builders Corp.* (1976), 42 Ill. App. 3d 668, 674. See also 5 Am. Jur. 2d *Architects* sec. 24 (1962); Annot., 25 A.L.R.2d 1085, 1100 (1952).) The circuit court's denial of Rosos' attempt to have a witness testify as to the diminution in property value resulting from the defective concrete was in error. The judgment as to damages therefore must be vacated and the cause remanded for a new trial on the issue of damages only. On retrial the jury should be permitted to consider evidence as to the cost of correcting the defective concrete, as well as evidence relating to diminution in value. The jury should be instructed that the usual measure of damages is the cost of correcting the defects, unless the jury finds from the evidence that corrective measures would entail unreasonable demolition of the existing structure or that the cost of such corrections would be unreasonably disproportionate to the benefit to Rosos, in which case the measure of damages is the impliedly lesser amount by which the defects have reduced the value of the property. *Park v. Sohn* (1982), 89 Ill. 2d 453, 464-65; *Mayfield v. Swafford* (1982), 106 Ill. App. 3d 610, 435 N.E.2d 953.

### IV

Also, on cross-appeal, Rosos contends that the circuit court erred by allowing the jury to apportion liability among defendants in contribution over its objection, contrary to *Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1, 374 N.E.2d 437,

302

which permitted apportionment of damages among joint tortfeasors in causes of action arising on or after March 1, 1978. (See also Ill. Rev. Stat. 1981, ch. 70, pars. 301 through 305.) We agree. The instant cause of action arose in 1975, well before the relevant date. The right to contribution among joint tortfeasors did not exist in Illinois until authorized by the supreme court in *Skinner* (see, *e.g., Justus v. Abex Corp.* (1983), 117 Ill. App. 3d 1018, 454 N.E.2d 3), and therefore no legal basis existed for its application to the case *sub judice.*

For the foregoing reasons, the judgment of the circuit court assigning liability for negligence is affirmed; that portion of the judgment awarding damages and apportioning liability is vacated and the cause is remanded for further proceedings consistent with this opinion.

Affirmed in part; vacated and remanded in part.

STAMOS and PERLIN, JJ., concur.