**PENSION BENEFIT GUARANTY CORPORATION, as Statutory Trustee of the Alan Wood Steel Company Salaried Pension Plan**

v.

**PINCUS, VERLIN, HAHN, REICH & GOLDSTEIN PROFESSIONAL CORPORATION and/or Pincus, Verlin, Hahn, Reich & Goldstein, a Partnership, Erwin L. Pincus and Pace Reich.**

**Civ. A. No. 83–5244.**

United States District Court,
E.D. Pennsylvania.

June 18, 1984.

---

13. See supra, n. 4.

Thomas Paine, Craig & Macauley, Boston, Mass., for plaintiff.

Thomas Preston, Duane, Morris & Hecksher, Philadelphia, Pa., for defendants.

## MEMORANDUM

NEWCOMER, District Judge.

This action arises out of the exclusion of a creditor from the distribution of a bankrupt estate. The creditor has sued the law firm that was counsel to the creditors' committee of a class of creditors of which plaintiff was a member. Defendants seek summary judgment on the grounds that no attorney-client relationship existed between them and plaintiff and that plaintiff's own negligence exceeded that of defendants', if any. Plaintiff seeks summary judgment, in essence, as to defendants' liability.

The operative facts as to which no dispute exists are as follows. On June 10, 1977, Alan Wood Steel Company (AWS) filed a petition for arrangement under Chapter 11 of the Bankruptcy Act. Plaintiff is the statutory trustee of two AWS pension plans. On February 2, 1979 plaintiff filed two proofs of claim: No. 3048 for unfunded, vested benefits due to participants in the Hourly Plan and No. 3049 for unpaid contributions and interest allegedly due under the Salaried Plan. Objections were filed to both claims. Subsequently a

stipulation was entered into by the relevant parties in which Claim No. 3048 was withdrawn and objections to Claim No. 3049 were withdrawn provided plaintiff agreed to submit the claim to arbitration as a Class C claim.

In June of 1979 a Class C creditors' committee was nominated by the Class C creditors and approved by the Bankruptcy Court.[1] Defendants were appointed counsel to the committee. In late May defendants contacted each Class C creditor to request its acceptance of the Modified Plan of Arrangement and its agreement to have its claim, if disputed, submitted to arbitration. Plaintiff approved the Modified Plan and agreed to submit its claim to arbitration but crossed out a provision that would have made the arbitrator's decision final and binding. Plaintiff believed such a provision was unsupported by either the April stipulation or the Modified Plan.

In August of 1979 a dispute arose between the United Steel Workers Union and the receivers of Alan Wood Steel concerning the termination date of the pension plans. That dispute was resolved in late August. AWS paid the Union $250,000 in exchange for its agreement not to contest the previously agreed-upon November 1, 1977 termination date. Defendants were not involved in the dispute or its resolution. Plaintiff was not a party to the dispute but apparently was implicated in its resolution, as is discussed below.

The Modified Plan was approved by the Bankruptcy Court on August 30, 1979. The Plan expressly included in Class C the claim of "any fiduciary, including the Pension Benefit Guaranty Corporation, entitled to collect amounts due from the Debtor to its Pension Plans." Thereafter defendants, in an apparently uncertain capacity, participated in hearings and arbitrations concerning disputed claims. On November 19, 1981, defendants delivered to the Bankruptcy Court their calculations as to the gross and net amounts of allowable Class C claims. Believing that plaintiff had waived its Claim No. 3049 by virtue of the August, 1979 resolution of the dispute with the Steelworkers, defendants did not include plaintiff's claim in the list of allowable Class C claims. Defendants never advised plaintiff of their conclusion concerning the waiver and no party filed a formal objection to plaintiff's claim.

In reliance on defendants' calculations and their representation that the calculations were "mathematically accurate" the Bankruptcy Court ordered and effected distribution of the Class C fund during December 1981. Plaintiff did not learn of its exclusion until after the 10-day period for appeals had expired.

Plaintiff proceeds on essentially three theories. First, it argues that it entered into an attorney-client relationship with defendants. Next, it relies on a third-party beneficiary theory.[2] Lastly, plaintiff argues that reference must be had to federal law in defining the relationship among individual creditors, the committee, and counsel.

Defendants respond that the absence of an attorney-client relationship between plaintiff and defendants precludes the imposition of any duty on defendants to safeguard plaintiff's interests. They rely on *Guy v. Liederbach*, 501 Pa. 47, 459 A.2d 744 (1983). In *Guy*, plaintiff was deprived of her legacy under a will because she was a subscribing witness to the will. She brought suit against the attorney who drafted the will and directed her to witness it. The Pennsylvania Supreme Court adhered to its strict privity rule for malpractice actions, holding that plaintiff must show an "attorney-client relationship or a special undertaking by the attorney furnishing the professional services ... as a necessary prerequisite for maintaining

---

**1.** The committee is to be chosen by the 100 largest creditors of the class. Plaintiff was unquestionably the largest single creditor in the class but was not given notice by defendants of the meeting at which the committee was selected.

**2.** A threshold difficulty in plaintiff's reliance on this theory is that it is not plead in the complaint.

such suits in trespass on a theory of negligence."

Defendants' argument is based on the premise that they were counsel to the creditors' committee and not to plaintiff. As such, their responsibilities included maximization of the Class C fund and orderly and expeditious distribution of that fund. Defendants argue that at the distribution stage, counsel to a creditors' committee routinely takes legal positions that are adverse to individual members of the class. In fact, the Bankruptcy Code now specifically provides that counsel to a creditors' committee may not, while employed by the committee, represent any other entity in connection with the case. 11 U.S.C. § 1103(b). Thus, defendants argue, they could not possibly have entered into an attorney-client relationship with plaintiff while they were assisting in the administration of the Class C fund. They also contend that to impose any sort of fiduciary responsibility with respect to *individual* creditors on counsel to a creditors' *committee* would inevitably open counsel to widespread attack by creditors who are merely dissatisfied with the results of distribution.

■ I disagree. The responsibility of the creditors' committee to the class it represents is well settled:

> Although the creditors' committee represents the interests of all creditors, its main function is to advise the creditors of their rights and the proper course of action in the bankruptcy proceedings. [collecting authorities]. Moreover, the committee owes a fiduciary duty to the creditors, and must guide its actions so as to safeguard as much as possible the rights of minority as well as majority creditors. [collecting authorities].

*Bohack Corp. v. Gulf & Western Industries*, 607 F.2d 258, 262 n. 4 (2d Cir.1979). The committee owes "undivided loyalty and allegiance" to the group it represents. *In Re Realty Associates Securities Corp.*, 56 F.Supp. 1008, 1009 (E.D.N.Y.1944), *aff'd*, 156 F.2d 480 (2nd Cir.1946).

■ Unfortunately, neither the Bankruptcy Act nor its accompanying caselaw specifically addresses the obligations of counsel to the creditors' committee; however, caselaw suggests that a broad sense of equity and fiduciary duty pervades the entire bankruptcy administration and that counsel to a creditors' committee undertakes the obligation to represent the interests of the entire class fairly. *Matter of Arlan's Department Stores*, 615 F.2d 925, 932 (2d Cir.1979); *Berner v. Equitable Office Building Corp.*, 175 F.2d 218 (2d Cir.1949) (Attorney who was retained by one member of a class of shareholder-creditors in a bankruptcy proceeding enters into a fiduciary relationship with entire class); *Matter of REA Holding Corp.*, 8 B.R. 75, 81 (Bkrptcy.S.D.N.Y.1980).

■ The existence of an attorney-client relationship is reinforced by payment of counsel fees out of the fund available for distribution to the members of Class C. *Lawall v. Groman*, 180 Pa. 532, 537, 37 A. 98 (1897). *See also Silbiger v. Prudence Bonds Corp.*, 180 F.2d 917 (2d Cir.1950). Defendants' argument that they represented only the creditors' committee is further undermined by the numerous letters they sent to the class as a whole as well as to individual class members containing statements such as "our law firm was retained by the Class C creditors committee to represent all former employees of Alan Wood Steel Company." [3] Thus, defendants recognized their undertaking encompassed more than representation of the committee alone.

In the early stages of the AWS bankruptcy proceedings the role of counsel to the committee was relatively clear. This was because the individual creditors, the committee, and counsel shared the common goal of maximization of the fund available for distribution to Class C creditors. Once the amount of the fund was determined, clarity faded. At this point individual interests became adverse because quite clearly, the larger the allowable claim of one

---

**3.** The relationship arising under this theory may be analogized to that existing between named plaintiff's counsel and the members of the class in a class action under F.R.C.P. 23.

creditor, the smaller the fund available for distribution to others. Equally clearly, counsel to the committee cannot be placed in the untenable position of maximizing the distribution to individual creditors.

As I understand it, however, plaintiff does not complain that defendants failed to *maximize* its award. Instead, its complaint is that contrary to the Bankruptcy Rules defendants unilaterally and consciously excluded plaintiff's Claim No. 3049 from the proceedings and utterly failed to advise plaintiff of their actions. In my view, therefore, the question is the scope of the duty to be imposed upon counsel to creditors' committees. While I believe the danger posed by defendants is real, on the facts of this case I foresee no undue harm resulting from a conclusion that defendants had an attorney-client relationship with plaintiff which imposed upon them an obligation to plaintiff to utilize care, skill, prudence, and diligence in the performance of their obligations as counsel to the Class C creditors committee. Defendants cannot, therefore, be held to an obligation to maximize any individual creditors' interest, but they can be held to an obligation to utilize due care in the performance of the duty they expressly assumed: to administer distribution of the Class C fund "in accordance with the law." [4]

Defendants' own brief states that the duty of the committee—who defendants undisputably represented—was "merely to see that the creditors' interests were considered fairly." [5] Defendants further characterize as "undisputed" the proposition that "a creditors' committee and its counsel owe a general obligation of fairness and loyalty to the individual members of the class." These obligations appear to me to be amongst the very ones which plaintiff claims were breached.

■ The question remains whether, as a matter of law, defendants' actions consti-

tuted negligence. The standard of care in Pennsylvania malpractice cases is measured by the skill generally possessed and employed by practitioners of the profession. *Lentino v. Fringe Employee Plans*, 611 F.2d 474, 480 (3d Cir.1979); *Davis v. Associated Indemnity Corp.*, 56 F.Supp. 541 (E.D.Pa.1944).

■ Pennsylvania courts require expert testimony to establish the specific standard of care and to assist in the determination of a defendant's conformity to the relevant standard. *National Cash Register v. Haak*, 233 Pa.Super. 562, 335 A.2d 407 (1975). Furthermore, the Third Circuit has concluded that expert testimony is required even in bench trials of legal malpractice claims "except where the matter under investigation is so simple, and the lack of skill so obvious, as to be within the range of the ordinary experience and comprehension of even non-professional persons." *Lentino v. Fringe Employee Plans*, 611 F.2d 474, 481 (3d Cir.1979). I simply do not believe that the realm of administration of a bankrupt estate is an area with which laymen are familiar. Thus, entry of summary judgment as to liability without the benefit of expert testimony would be improper. This issue will therefore be left to the jury's determination.

■■ The issue of plaintiff's contributory negligence will also be left to the jury. It appears to me that under the applicable law some measure of responsibility is placed upon the individual to keep abreast of bankruptcy proceedings in which he or she has an interest. *See Matter of Garland*, 401 F.Supp. 608 (E.D.Pa.1975).

■ Plaintiff also seeks an order removing the issue of waiver from the trial. Mr. Reich stated he excluded plaintiff's claim from the distribution because he thought it had been waived in August of 1979 as a result of the resolution of the dispute with

---

4. I hesitate to characterize the relationship as that of attorney and client in light of my conclusion that defendants cannot be held to the same zealous representation that is required by the Disciplinary Code; however, I believe the description is fair when read in the context of this memorandum.

5. Thus, they periodically advised class members of the steps necessary to secure claims. Plaintiff, in contrast, was excluded from the class without notice.

the steelworkers concerning the termination date of the pension plans. The background of that dispute is as follows: In September of 1978 the Bankruptcy Court authorized the Receivers of AWS to reject its Salaried Plan (covered by Claim No. 3049) and therefore cease contributions to it effective November 1, 1977. In August of 1979 the Steelworkers Union, contending that the November, 1977 termination date adversely affected certain of its members, threatened to challenge that date in court. The Steelworkers and the Receivers quickly reached an agreement whereby AWS paid $250,000 to the Steelworkers "to be allocated among such employees and former employees who may be affected by the setting of November 1, 1977 as the Termination Date of the Debtor's Pension Plans." In exchange, the Steelworkers agreed to drop their challenge.

Accompanying the settlement stipulation was a letter from the Steelworkers' counsel which stated as follows:

It is also my understanding that at the August 30, 1979 hearing on the joint application of which this Stipulation is a part the Pension Benefit Guaranty Corporation will represent to the court that, based on this Stipulation, the PBGC will not assert any potential claim for additional pension fund contributions or other liability to the pension fund by Alan Wood Steel, the Debtor. Such potential claims by the PBGC, based on a 1978 termination date, could have been in an amount so great as to result in the withdrawal of the financial backing for the Alan Wood Modified Plan of Arrangement which, in the amount of $10,000,-000, is being provided by Mr. Benenson's Bowline Corporation.

This letter apparently formed the basis for Mr. Reich's belief that the PBGC had waived Claim No. 3049.[6]

I note at the outset that defendants have never explained how a letter written by the steelworkers' general counsel could constitute a waiver by the PBGC of its claim

against the debtor AWS. Assuming, however, that the letter accurately represents the PBGC's intentions, I have been presented with no construction of this language that would explain why Mr. Reich believed it amounted to a waiver of PBGC's already-filed Claim No. 3049. To the contrary, the letter states that plaintiff would not assert any claim for "additional" pension fund contributions. It further refers to the "potential" claims as those "based on a 1978 termination date." Finally, the amount paid in settlement was to be distributed to those affected by the November 1, 1977 termination date. Thus, it is rather clear that the stipulation and accompanying letter involved a settlement of post-November 1977 pension claims. Defendants have presented no argument that the language is ambiguous, and they have come forward with no extrinsic evidence which would support an alternate interpretation.

This conclusion is further reinforced by the language of the Modified Plan of Arrangement. In the Modified Plan, which was approved by the Bankruptcy Court on August 30, 1979—some one week to ten days after the above stipulation was entered into—Class C is defined as follows:

Class C—All employees and former employees (except officers and directors) holding claims under the provisions of Sections 64a(1) or 64a(2) of the Bankruptcy Act, or otherwise, for wages or fringe benefits, including rights to receive pension benefits, and *any fiduciary, including the Pension Benefit Guaranty Corporation, entitled to collect amounts due from the Debtor to its Pension Plans.*

Defendants have not provided an explanation for the underscored language to controvert plaintiff's contention that it is a rather obvious reference to Claim No. 3049. Thus, the Bankruptcy Court apparently did not consider the steelworkers' stipulation to constitute a waiver of the PBGC's claim.

6. Defendants also make reference to the fact that the stipulation was discussed thoroughly in the presence of plaintiff's counsel at an August 30, 1979 court hearing. Since the content of that discussion has not been provided to the Court I can only assume it is not material to my decision.

Finally, the conclusion that no waiver occurred is reinforced by the provisions of the Bankruptcy Act itself. Generally speaking a creditor is free to withdraw his claim against the debtor. However, the Rules in effect at the relevant time limited that ability at certain stages of the proceedings:

> If after a creditor has filed a claim, an objection is filed thereto or ... the creditor has accepted the plan or otherwise has participated significantly in the case, he may not withdraw the claim save on application or motion with notice to the trustee, receiver, or debtor in possession, and on order of the court containing such terms and conditions as the court deems proper.

Bankruptcy Rule of Procedure 11–34 (now Bankruptcy Rule 3006). Similarly, Rule 11–38(b) provided as follows:

> Any person who has waived his right to share ... in payments under the plan shall file with the court, prior to confirmation of the plan, a statement setting forth the waiver and any agreement with respect thereto made with the debtor, his attorney, or any other person.

Defendants have pointed to no evidence that would indicate either of these procedures was followed by PBGC. I therefore conclude no waiver or withdrawal of Claim No. 3049 occurred by virtue of the August, 1979 stipulation.

Defendants argue that a material issue exists with respect to whether defendants honestly believed plaintiff's claim had been waived. They rely on language found in *Brown v. Pittsburgh*, 409 Pa. 357, 360, 186 A.2d 399 (1962).

> Waiver is essentially a matter of intention. It may be expressed or implied. '[I]n the absence of an express agreement, a waiver will not be presumed or implied contrary to the intention of the party whose rights would be injuriously affected thereby, unless by his conduct the opposite party has been misled, to his

prejudice, into the honest belief that such waiver was intended or consented to.'

Once again, however, the defendants have failed to explain how plaintiff in any way misled them. To the contrary, plaintiff filed its claim, which apparently was uncontested. Without warning from defendants, it was then omitted from the distribution. I see absolutely no factual basis for an argument that PBGC waived its Claim No. 3049. Furthermore, I know of no basis on which I could conclude that state common law pertaining to waiver overrides the clear provisions of the Bankruptcy Act.[7]

Finally, plaintiff seeks a ruling that defendants cannot contest Claim No. 3049 in this action. I decline to so rule. Part of plaintiff's burden of proof with respect to damages is establishment of the validity and enforceability of its claim.

---

**7.** Of course, the jury must determine whether defendants' erroneous conclusion on this issue

constituted negligence.